**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**MARY TROUPE, et al.**                                          **PLAINTIFFS**

**v.**                              **CIVIL ACTION NO. 3:10-CV-153-HTW-LRA**

**GOVERNOR HALEY BARBOUR,**
**et al.**                                                      **DEFENDANTS**

**MEMORANDUM OF AUTHORITIES IN SUPPORT OF**
**MOTION TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS**

Defendants Haley Barbour, Governor of Mississippi, and Robert L. Robinson, Executive

Director of the Mississippi Division of Medicaid, in their official capacities [collectively referred

to as "Medicaid"], respectfully submit this Memorandum of Authorities in Support of their

Motion to Dismiss or for Judgment on the Pleadings and ask this Court to dismiss the claims

against them.

## INTRODUCTION

Despite the Complaint's lengthy policy arguments and without diminishing Plaintiffs'

tribulations, this Court should focus its attention on the Complaint's singular charge:  The State

fails to provide children intensive mental health services in a home or community-based setting.

Plaintiffs repeat this charge throughout the Complaint.  The claims are premised overtly on the

State's alleged failure to provide necessary services.  Medicaid's obligation, so the argument

goes, arises from the Medicaid Act's requirement that needy children receive early preventive

screening, diagnosis, and treatment services, commonly referred to by the acronym EPSDT.  *See*

42 U.S.C. §§ 1396a(a)(43), 1396d(r).  Plaintiffs contend that intensive mental health services in a

home or community-based setting qualify under the EPSDT provisions.  Yet, Medicaid does not *provide* services.  Medicaid *pays* for medically necessary services rendered.

The Complaint does not allege any failure by Medicaid to pay for medically necessary services.  Medicaid is a voluntary federal-state program that requires participating states to adhere to certain federal laws and regulations in order to receive federal matching funds.  The "cooperative federalism" embodied by the Medicaid Act is premised on a *quid pro quo* - money from the federal government in exchange for state administration of a payment program for medically necessary services rendered.  *See Harris v. McRae*, 448 U.S. 297, 301 (1980) ("The Medicaid program was created in 1965 . . . for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons.").  As described in pure financial terms by one federal circuit court, "the Medicaid statute . . . defrays certain medical expenses of individuals such as these plaintiffs who lack the wherewithal to pay the expenses themselves."  *Bruggeman v. Blajojevich*, 324 F.3d 906, 908 (7th Cir. 2003) (Posner, J.).  "Medicaid is a payment scheme, not a scheme for state-provided medical assistance, as through state-owned hospitals."  *Mandy R. v. Owens*, 464 F.3d 1139, 1146 (10th Cir. 2006) (quoting with approval, *Bruggeman* at 910)).

Or, as this Court has explained, " [t]he Division of Medicaid is an insurer of last resort; it pays all the medical bills of Medicaid recipients."  *Smith v. Union Nat'l Life Ins. Co.*, 187 F. Supp. 2d 635,649 (S.D. Miss. 2001) (Bramlette, J.).  Medicaid as insurer is an apt description.  Indeed, as a federal-state agreement, the Medicaid Act "is much in the nature of a contract."  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (*Pennhurst I*) (discussing nature of Spending Clause legislation - "in return for federal funds, the States agree to comply

2

with federally imposed conditions").  The contract is between the federal government and the States, with eligible individuals akin to third-party beneficiaries.  The legal relationship, obligations, and benefits among these entities are defined and circumscribed by the Medicaid Act.

Recent Congressional enactments have underscored the cooperative, financial relationship between the federal government and the States.  Specifically, the Deficit Reduction Act of 2005 ("DRA") allows State's to *require* eligible individuals to enroll in "benchmark coverage" and "benchmark-equivalent coverage" benefit packages in order to receive Medicaid benefits.  DRA  §§ 6001-6203 , Pub. L. No. 109-171, 120 Stat. 4, 88-92 (2006) (codified at 42 U.S.C. § 1396u-7). For example, "benchmark coverage" is identified as the "standard Blue Cross/Blue Shield preferred provider option."  42 U.S.C. § 1396u-7(b)(1)(A).  Under such arrangement, Medicaid is further removed from beneficiaries, essentially acting as the "premium payer of last resort."

Here, under Count I, Plaintiffs seek the benefit of intensive mental health services in a home or community-based setting to treat or ameliorate their conditions.  (Compl., ¶ 64, citing 42 U.S.C. §§ 1396a(a)(43), 1396d(r)).  Medicaid's obligation, however, extends only to providing "medical assistance" within the meaning of the Act.  42 U.S.C. § 1396a(a).  The Fifth Circuit, among other courts, has held that "the definition of 'medical assistance," as is used throughout the Medicaid Act, is clear from the text of the Act itself.  The Act explicitly provides that 'medical assistance' means 'payment' for various medical services."  *Equal Access for El Paso,*

*Inc. v. Hawkins*, 562 F.3d 724, 727 (5th Cir. 2009). Medicaid does not provide services. Medicaid pays for medically necessary services rendered.[1]

As will be discussed more fully herein, this Court should dismiss Count I for a variety of reasons.[2] First among them, this Court cannot exercise subject matter jurisdiction over Plaintiffs' claims against Medicaid because these Plaintiffs cannot assert an injury sufficient to confer standing. Simply put, no payment has been denied Plaintiffs, and they do not claim otherwise. Nor can Plaintiffs overcome the Eleventh Amendment bar to the exercise of federal jurisdiction over the State. Because Plaintiffs do not state an ongoing violation of federal law, the Eleventh Amendment bars Plaintiffs' claims against Medicaid. Additionally, the Medicaid Act creates no rights enforceable through a private right of action, particularly where Plaintiffs seek to require Medicaid to actually provide services rather than to pay for services rendered.

## ARGUMENT

## I.     This Court lacks subject matter jurisdiction over Plaintiffs' claims.

---

[1]The Complaint defines "intensive home- and community-based services" as including "a comprehensive assessment, intensive case management services, mobile crisis services, in-home therapy, behavioral support services, family education and training, and therapeutic foster care." (Compl., ¶ 17). Although the Complaint makes reference to "therapeutic foster care," (Compl., ¶ 17), it is unclear whether any of the named Plaintiffs are asking Medicaid to provide such care, especially given the Complaint's admission that "therapeutic foster care is not available as a Medicaid-covered service." (Compl., ¶ 29 n. 1). Further, no one can contest that Medicaid does not place anyone in custody, hold custody of anyone, or regulate foster care in any way. If Plaintiffs clarify that they are asking this Court to order Medicaid to provide therapeutic foster care, then Medicaid will address the issue at that time.

[2]Dismissal of Count I is sought in the instant Motion to Dismiss and Memorandum for purposes of clarity and judicial economy. Count I deals solely with the Medicaid Act and can only be directed toward Medicaid officials. Count II, however, addresses alleged discrimination in violation of federal statutes that is directed toward all Defendants. The distinct nature and complexity of these claims necessitates separate treatment. Medicaid will seek dismissal of Count II in a separate motion, possibly in conjunction with the other Defendants. Therein, Medicaid will show Plaintiffs' lack of standing and failure to state a claim upon which relief can be granted under Count II. Additionally, Medicaid will show its entitlement to immunity under the Eleventh Amendment. Medicaid has preserved these defenses in its Answer to the Complaint.

The Fifth Circuit has explained the parameters of a Rule 12 motion challenging subject matter jurisdiction, as follows:

> In general, where subject matter jurisdiction is being challenged, the trial court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case. "A court may base its disposition of a motion to dismiss for lack of subject matter jurisdiction on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the court can decide disputed issues of material fact in order to determine whether or not it has jurisdiction to hear the case.

*Montez v. Department of the Navy*, 392 F.3d 147, 149 (5th Cir. 2004) (internal citations omitted). Additionally, the burden of proof is on the party asserting jurisdiction. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

As explained in Part A below, Plaintiffs lack standing to sue Medicaid because Plaintiffs failed to allege and have not suffered an injury in fact. Part B will show that the Eleventh Amendment bars Plaintiffs' claims against the State officials because Plaintiffs failed to assert an ongoing violation of federal law perpetrated by Medicaid officials.

### A.      Plaintiffs lack standing, and/or their claims are not ripe.

Plaintiffs have not attempted to obtain from Medicaid the very benefits Plaintiffs allege have been denied. Thus, they lack standing, and their claims are not ripe for review. The United States Constitution, Article III, section 2, clause 1, requires an actual case or controversy to sustain federal jurisdiction. *See Amar v. Whitley*, 100 F.3d 22, 23 (5th Cir. 1996). "The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government." *Allen v. Wright*, 468 U.S. 737, 750 (1984). The question of Article III justiciability is of critical importance and "not merely a troublesome hurdle to be overcome if

possible so as to reach the merits of the lawsuit." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 476 (1982).

Litigants seeking to invoke federal court jurisdiction must show that they have standing and that the matter is ripe.[3]  *E.g.*, *Daimler Chrysler Corp. v. Cuno*, 547 U.S.332, 352 (2007); *City of Los Angeles v. Lyons*, 41 U.S. 95, 101 (1983).  To show standing, a plaintiff must: (1) have suffered injury in fact; (2) demonstrate a causal connection between the injury and the conduct complained of; and (3) show that a favorable decision will address plaintiff's injury.  *E.g.*, *U.S. v. Hays*, 515 U.S. 737, 742-43 (1995); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "Injury in fact" requires a showing of an invasion of a legally protected interest which is "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560.

Bearing close affinity to the requirements of standing, ripeness considers "whether the harm asserted has matured sufficiently to warrant judicial intervention."  *Warth v. Seldin*, 422 U.S. 490, 499 n. 10 (1975).  The slight distinction between the two standards is that "ripeness is peculiarly a question of timing[.]"  *Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 140 (1974).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. U.S.*, 523 U.S. 296, 300 (1998) (internal quotations and citations omitted); *see also Gemtel Corp. v. Community Redevelopment Agency*, 23 F.3d 1542, 1545-46 (9th Cir. 1994) (noting that when resolution of a plaintiff's claim "does not depend on any future factual developments, the claim is ripe").  The Supreme Court's

---

[3]"[N]amed plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey,* 518 U.S. 343, 357 (1996) (internal quotation marks omitted). Therefore, "prior to the certification of a class, the district court must determine that at least one named class representative has Article III standing to raise each class [claim]." *Prado-Steiman v. Bush,* 221 F.2d 1266, 1279-80 (11th Cir. 2000).

discussion in *Abbott Laboratories* of the ripeness doctrine in the context of reviewing

administrative agency decisions is instructive:

> The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution. Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Id.*, 387 U.S. at 148-49 (footnote omitted).

A claim may be ripe, to be sure, even though the injury has not yet been sustained.  The

standard is that the injury must be certain to occur, so that it "is in no way hypothetical or

speculative."  *Reg'l Rail*, 419 U.S. at 143 ("Where the inevitability of the operation of a statute

against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy

that there will be a time delay before the disputed provisions will come into effect.").  That is to

say, the harm at issue need not be "actual," so long as it is "imminent." *See Lujan*, 504 U.S. at

578.

In the case at hand, the named Plaintiffs allege that Medicaid has caused injury to them by

failing to provide medically necessary "intensive home-based and community-based services,"

which they claim they are entitled to under the Medicaid Act.  (*See* Compl. at ¶¶ 36-39.)

However, none of the Plaintiffs allege that they have applied to Medicaid for, or been denied by

Medicaid, the particular EPSDT services to which they claim they are entitled.  More

importantly, Plaintiffs have made no allegations that they have applied for and been denied *payment* by Medicaid for any medically necessary service.

"There is a long line of cases . . . that hold that a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit." *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220-21 (9th Cir. 1992) (collecting cases).  The purpose of "[r]equiring a party to have actually confronted the policy he now challenges in court" is to "establish[] the existence of a well-defined controversy between the parties." *Id.* at 1221 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).  That is, "the failure to make a concrete request can leave the dispute between the parties too nebulous for judicial resolution, because the precise nature of [the plaintiff]'s asserted injury – and the appropriate relief – are unclear . . . ." *Id.* Here, Plaintiffs cannot show that Medicaid would not be able or willing to meet their needs.

A few facts relevant to jurisdiction highlight Plaintiffs' lack of standing.  For example, L.S. is presently enrolled in a Medicaid program that provides intensive home- and community-based services, and L.P. turned down those very services when offered by Medicaid.  (Exs. 1-2, attached to mot. to dis.).  As described on its website,[4] Medicaid offers a federally approved home- and community-based waiver program called Mississippi Youth Programs Around the Clock or MYPAC.  (Ex. 3, attached to mot. to dis.).  As explained by Medicaid:

> Many Mississippi families are reluctant to seek help for their youth because they do not want them to spend weeks or even months in a psychiatric residential treatment facility. With MYPAC they can receive the services they need without having to leave their home, family or school. Also, with MYPAC, parents and/or

---

[4] http://www.medicaid.ms.gov/mypac.aspx

> guardians are much more involved with the planning and implementation of the
> services provided for their child.
>
> * * *
>
> The services provided by MYPAC include Intensive Case Management,
> Wraparound Services, and Respite Services. An Individualized Service Plan will
> be developed by each participant, parent/guardian and the MYPAC provider
> which will be used to identify and address participants' and their families'
> individual needs. Providers will be expected to be available to participants and
> their families around the clock.

(Ex. 3).  MYPAC is precisely the type of bundled services that Plaintiffs claim they are not

receiving.  However, L.S. has been enrolled in MYPAC since May 5, 2010, (Ex. 1), and L.P.

refused to enroll in MYPAC on March 3, 2009.  (Ex. 2).  L.S. has suffered no injury because

Medicaid has enrolled him in a program that it funds, leaving his claim moot at the very least;

and L.P. cannot manufacture standing or a controversy by refusing, pre-suit, the very relief she

seeks in the present action.  As for J.B. and L.M (as well as the others), they fail to allege

whether they have applied for and been denied anything by Medicaid, including MYPAC.

Plaintiffs cannot dispute Medicaid's willingness to pay for necessary services as provided by

both law and Medicaid policy.[5]  As both the facts and the Complaint reveal, Plaintiffs have never

tested their theory that Medicaid would not or could not meet their needs.

Further supporting Medicaid's point, the Complaint contains only conclusory and generic

assertions, such as the following:

---

[5]The relevant EPSDT provisions of the Medicaid Provider Policy Manual, §§ 73.01-
73.09, may be found online at:

http://www.medicaid.ms.gov/ProviderManualSection.aspx?Section%2073%20-%20Mississippi
%20Cool%20Kids%20(EPSDT)%20Program

"J.B. will not receive intensive home-based and community-based services upon discharge from [treatment facility].  J.B.'s community mental health center does not offer such services.  . . .  [L.P.] has never received intensive home-based and community-based services.  These intensive services are not offered by her community mental health center. . . . Her discharge plan . . . does not include any arrangements to connect [her] with needed intensive home-based and community-based services.  . . .  [L.M.] is not receiving intensive mental health services. . . . [H]is community mental health center . . . does not provide intensive home-based and community-based services. . . . L.M. was recently released from the training school, but has not been provided with the intensive mental health services he needs. . . .  L.S. has received only limited outpatient counseling and medication management from his community mental health center, which is open only two days per week. . . . L.S.'s aunt wants L.S. to return home, but L.S. needs intensive home-based and community-based services to support this transition.

(Compl. at ¶¶ 48-62.)  The Complaint also asserts that:

Mississippi has not included intensive home- and community based services in its state Medicaid plan; nor does Mississippi otherwise make intensive home- and community-based services available on a consistent, statewide basis to children for whom the services are medically necessary.  Outside of its Medicaid program, Mississippi offers a limited amount of intensive home- and community-based services to a limited number of children in limited areas of the state, through a federal demonstration grant program called MYPAC.

(Id. at ¶ 29.)  Plaintiffs further allege that:

The majority of children with significant behavioral and emotional disorders seek services through their regional community mental health center.  These centers are certified and overseen by Defendants.  Intensive home-based and community-based services are not available through these centers.  The majority of children served by the centers receive infrequent office-based therapy or counseling and medication, which alone are inadequate to meet the needs of children with significant behavioral or emotional disorders.  Some community mental health centers are open only a few days a week.

(Id. at ¶ 39.)

These allegations amount to nothing more than sweeping generalities about the limited

availability of "intensive home-based and community-based services" and the deficiencies in

Mississippi's community mental health center system.  Medicaid, of course, is not responsible

for delivering the services referred to in the Complaint and does not certify and regulate community mental health centers.  *See* Miss. Code Ann. § 41-4-7 (vesting State Board of Mental Health with authority over state mental health institutions and services).

Missing from the Complaint is a specific allegation that any of the named Plaintiffs have ever requested that Medicaid pay for the specific behavioral/mental health services that they claim they need, let alone that Medicaid has denied such a request.  Unless  Plaintiffs can show that they have applied to Medicaid for these services and that Medicaid has refused to reimburse a provider for the services, Plaintiffs have not suffered a legally cognizable injury.  That is to say, the named Plaintiffs' claims of injury are hypothetical at this point because it is unclear whether Medicaid would deny *each* of the named Plaintiffs' requests for *each* of the services that they claim are medically necessary, much less whether there is a substantial likelihood that such requests would be met with denials.  *See, e.g.*, *Summer H. v. Fukino*, 2009 WL 1249306, at *6-7 (D. Haw. May 6, 2009) (finding that plaintiffs challenging what they characterized as across-the-board reductions in EPSDT services had not sustained an injury in fact because they were "in the process of appealing their proposed cuts" and "adverse decisions [we]re [not] certain to follow the pending administrative reviews"); *cf. Hunter ex rel. Lynah v. Medows*, 2009 WL 5062451, at *5 (N.D. Ga. Dec. 16, 2009) (plaintiff's "allegations that he is subject to continuous reductions in his allotted care and that he does not receive proper notice and opportunity to respond to such reductions are sufficiently concrete to confer standing for the remaining claims").  Indeed, the experiences of L.S. and L.P. show Medicaid's ability and willingness to meet its legal obligations.  (Exs. 1-2, discussed *supra* at 8-9).

Looked at another way, there is not a sufficiently concrete controversy between the parties.  In order to have standing, Plaintiffs would need to allege that they have "confronted the policy."  *Madsen*, 976 F.2d at 1221.  Here, Plaintiffs do not even allege that Medicaid has a *de facto* policy of not paying for behavioral/mental health services for Medicaid-eligible children that they "now challenge[] in court."  *Id.*  In the absence of an allegation by the named Plaintiffs that they have made " a concrete request" to Medicaid for the particular EPSDT services which they claim they are being denied, "the dispute between the parties [is] too nebulous for judicial resolution, because the precise nature of [the plaintiffs'] asserted injur[ies] . . . [is] unclear."  *Id.*

By the same token, Plaintiffs' claims against Medicaid are unripe.  Their claims "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas*, 523 U.S. at 300; *see also Summer H.*, 2009 WL 1249306, at *6 ("There is no indication that adverse decisions are certain to follow the pending administrative reviews, and so Hannah H. and Hannah M.'s claims cannot be said to be ripe.").  Thus, the issues are not fit for judicial resolution because the Complaint fails to identify a definite and final decision by Medicaid to not pay for the services that Plaintiffs may want but, apparently, have not applied for.  *See, e.g.*, *Abbot Labs.*, 387 U.S. at 148-49; *Standard Alaska Production Co. v. Schaible*, 874 F.2d 624, 627 (9th Cir. 1989) ("A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." ); *California v. Bennett*, 833 F.2d 827, 833 (9th Cir. 1987) (noting that a court should "look[] to whether the agency action represents the final administrative word to insure that judicial review will not interfere with the agency's decision-making process"); *Imperial Carpet Mills, Inc. v. Consumer Products Safety Comm'n*, 634 F.2d 871, 874 (5th Cir. 1981) (holding that case was not ripe because issues raised

"[we]re more properly left to the agency as an initial matter" and agency "action w[ould] turn on factual development and policy determinations not [then] known").

Finally, Plaintiffs' allegations fail to demonstrate a causal connection between the injury they have suffered and the conduct of which they complain.  Plaintiffs make no specific claim or factual allegation describing how Medicaid violated *their* rights under the Medicaid Act, and the Complaint fails to attribute any specific actions to Medicaid as violations of the Medicaid Act. Rather, Plaintiffs' allegations assume that Medicaid is unwilling to pay providers to supply these services to them *only* because their local community mental health centers do not offer the exact services they claim they are entitled to under federal law.  Moreover, Plaintiffs' allegations identifying systemic deficiencies in the provision of behavioral/mental health services to Medicaid-eligible children are inadequate to establish that *Plaintiffs'* inability to gain access to services is fairly traceable to any action taken by Medicaid.  Again, the experiences of L.S. and L.P. directly refute Plaintiffs' vague allegations.  (Exs. 1-2).  In sum, the Complaint's failure to show any causative link between the named Plaintiffs' alleged injuries and any formal decision made by Medicaid is fatal to the second prong of the standing inquiry.

Simply put, Plaintiffs do not adequately allege that they have sought the services they want, that they have applied to Medicaid for payment, and that Medicaid has refused to pay for medically necessary services.  Based on the foregoing, the allegations in the Complaint are insufficient to confer standing on the named Plaintiffs; and said claims are not ripe for judicial consideration.  For these reasons, this Court lacks subject matter jurisdiction over Count I.

**B.     The Eleventh Amendment bars Plaintiffs' claims.**

Plaintiffs sued the State Defendants in their official capacities, seeking declaratory and injunctive relief.  As discussed below, these Defendants are entitled to the immunity from suit recognized in the Eleventh Amendment to the United States Constitution.  *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999).  The Eleventh Amendment provides as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI.[6]  Absent waiver or a valid abrogation of the State's immunity by Congress, the State may not be sued in federal court regardless of the relief requested.  *Green v. Mansour*, 474 U.S. 64, 68 (1986); *Martinez v. Texas Dep't of Criminal Justice*, 300 F.3d 567, 573 (5th Cir. 2002).  This immunity extends to state agencies, departments and other arms of the state.  *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993); *Richardson v. Southern University*, 118 F.3d 450, 452 (5th Cir. 1997).  Equally, Eleventh Amendment immunity extends to state officials acting within their official capacities.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66-71 (1989). Congress has not abrogated and Mississippi has not waived its Eleventh Amendment or sovereign immunity in the present context.

---

[6]The Supreme Court "[h]as consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state."  *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Lakshman v. Mason*, No. 3:05cv151 HTW-JCS, 2006 WL 2827683, at *3 (S.D. Miss. Sept. 30, 2006). (Wingate, J.).

The immunity analysis begins with the assumption that Plaintiffs' official capacity claims, which act as claims against the State,[7] are barred by the Eleventh Amendment.  To overcome this bar, Plaintiffs must show that their suit fits within the narrow exception carved out in *Ex parte Young*, 209 U.S. 123 (1908).  In *Young*, the Supreme Court examined, *inter alia*, whether the Attorney General of Minnesota could be sued in federal court, consistent with the Eleventh Amendment, where the plaintiffs sought to enjoin the Attorney General from enforcing a state enactment alleged to be unconstitutional.  209 U.S. at 126-33.

In holding that the Eleventh Amendment did not impede such suit, the Court reasoned as follows:

> If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Id.* at 159-60.  Addressing the *Young* holding in a later case, the Supreme Court explained that "[t]his holding was based on a determination that an unconstitutional state enactment is void and that any action by a state official that is purportedly authorized by that enactment cannot be taken in an official capacity since the state authorization for such action is a nullity." *Papasan v. Allain*, 478 U.S. 265, 276 (1986).

---

[7] By suing the specified Defendants in their official capacities for declaratory and injunctive relief relating to the provision of services, Plaintiffs are quite plainly seeking to restrain the State from acting or to compel it to act; thus, Plaintiffs' official capacity claims are claims against the sovereign. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02, n. 11 (1984) (*Pennhurst II*).

The exception in *Young* has been described as a narrowly construed, legal fiction that exists "as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105, n. 25 (1984) (*Pennhurst II*) (quoting *Young*, 209 U.S. at 160). However, the Supreme Court has recognized "that the need to promote the supremacy of federal law must be accommodated to the constitutional immunity of the States." *Pennhurst II* at 105. Given these considerations, the Supreme Court has specifically limited the application of *Young*, stating that "[i]n accordance with its original rationale, *Young* applies only where the underlying authorization upon which the named official acts is asserted to be illegal." *Papasan*, 478 U.S. at 277.  Additionally, even where certain cases meet the formal *Young* requirements, the Supreme Court limits the *Young* fiction to "cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past, as well as on cases in which the relief against the state official directly ends the violation of federal law[.]" *Papasan* at 277-78.

Here, Plaintiffs seek an order from this Court requiring Medicaid to provide intensive mental health services in a home or community-based setting to treat or ameliorate their conditions.  (Compl., ¶ 64).  Medicaid's obligation, however, extends only to providing "medical assistance" within the meaning of the Act.  42 U.S.C. § 1396a(a).  The Fifth Circuit has held that "the definition of 'medical assistance," as is used throughout the Medicaid Act, is clear from the text of the Act itself.  The Act explicitly provides that 'medical assistance' means 'payment' for various medical services." *Equal Access for El Paso, Inc. v. Hawkins*, 562 F.3d 724, 727 (5th Cir. 2009) (citing *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 586 (5th Cir. 2004)).

16

Medicaid does not *provide* services.  Medicaid *pays* for medically necessary services rendered.  It appears that every circuit court that has directly examined the issue, including the Fifth Circuit, has held that Medicaid provides payment, not services.[8]  *See Equal Access*, *supra*; *Brown v. Tennesse Dep't of Fin. & Admin.*, 561 F.3d 542, 545 (6th Cir. 2009) ("[T]he state's duty is to pay for services, not ensure they are provided."); *Mandy R.*, 464 F.3d at 1146 (10th Cir. 2006) ("The State must pay for medical services, but it need not provide them."); *Westside Mothers v. Olszewski*, 454 F.3d 532, 540-41 (6th Cir. 2006) (*Westside Mothers II*) (holding that "medical assistance" means "financial assistance"); *Bruggeman*, 324 F.3d at 908-10; *see also Rite Aid of Pa., Inc. v. Houston*, 171 F.3d 842, 845 (3d Cir. 1999) ("The Medicaid Act requires states to pay for certain services . . . .").

From the *Young* perspective, the fact that Plaintiffs seek to compel Medicaid to act beyond its clear obligations excludes Plaintiffs from the *Young* fiction because there exists no ongoing violation of federal rights perpetrated by Medicaid.  *See Papasan*, 478 U.S. at 277-78; *Green*, 474 U.S. at 71.  Even if Medicaid were required to provide services, as opposed to payment, Plaintiffs have not identified what those specific services are and to whom each such service is *presently* being denied.  As discussed herein, L.S. is receiving the bundle of services he is asking this Court to mandate, and L.P. turned those services down prior to suit.  (Exs. 1-2 discussed *supra* at 8-9).  J.B. and L.M. do not indicate whether they have even sought enrollment in MYPAC or that they have been, or are likely to be, denied entrance to that program or any

---

[8]As noted by the Sixth Circuit, "[w]ithout expressly addressing the issue, two other circuits appear to have treated the statute as requiring the provision of actual services."  *Mandy R.* at 1143 n. 2 (citing  *Bryson v. Shumway*, 308 F.3d 79, 81, 88-89 (1st Cir.2002); *Doe v. Chiles*, 136 F.3d 709, 714, 717 (11th Cir.1998)).  The Fifth Circuit recently denied that any circuit split exists.  *Equal Access*, 562 F.3d at 728 n. 4 (finding that neither *Bryson* nor *Chiles* reached the issue whether "medical assistant" means "medical services").

other service.  Simply put, the named Plaintiffs fail to plead an ongoing violation of federal law by Medicaid.  Consequently, Count I must be dismissed.

## II.      Medicaid is entitled to judgment on the pleadings.

Rule 12(c) provides that "[a]fter the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings."  The standard for deciding a motion under Rule 12(c) is the same as that for deciding a motion under Rule 12(b)(6).  *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 n. 8 (5th Cir. 2002).  "[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief."  *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001) (internal quotation marks and citation omitted).  Even if Plaintiffs could establish jurisdiction, Medicaid would still be entitled to dismissal for two reasons:  First, the Medicaid Act does not provide clear notice to the State, through necessary "rights creating language," that the State could be sued in a private action.  Second, the structure of the Medicaid Act does not establish private rights enforceable through private causes of action.  Third, 42 U.S.C. § 1983 is not available to enforce the terms of the Medicaid Act.

### A.      Plaintiffs have not identified a right violated by Medicaid.

Plaintiffs fail to specifically identify individually enforceable rights.  As noted herein, Medicaid does not provide services; it provides payment for services.  *See supra* at 1-4, 16-17.  Plaintiffs do not complain about a lack of payment.  Even so, Medicaid will examine more closely the language of those provisions of the Act cited by Plaintiffs, (Compl., ¶ 64), to determine whether the Medicaid Act vests Plaintiffs with enforceable rights at issue in this suit.

18

The Supreme Court has found that in order for Spending Clause legislation, like the Medicaid Act, to create individual rights the language of the legislation must furnish "clear notice" of the conditions imposed. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The requirement of clear notice evolved from the contract analogy applied to Spending Clause legislation at issue in *Pennhurst I*. There, the Supreme Court reasoned as follows:

> Unlike legislation enacted under § 5, however, legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.

*Pennhurst I*, 451 U.S. at 17 (internal citations omitted). Subsequently, the Court, in *Blessing v. Freestone*, identified three factors to determine whether a statutory provision creates federal rights:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing*, 520 U.S. 329, 340-41 (1997).

*Gonzaga v. Doe* gave the Court an opportunity to clarify the first *Blessing* factor after some courts found enforceable federal rights "so long as the plaintiff falls within the general zone

of interest that the statute is intended to protect[.]"  536 U.S. 273, 283 (2002).  Rejecting this

approach, the Supreme Court found that "nothing short of an unambiguously conferred right" is

necessary to present a private right enforceable under § 1983.  *Gonzaga*, 536 U.S. at 283.

"Accordingly, it is *rights*, not the broader or vaguer 'benefits' or 'interests' that may be enforced

under the authority of that section."  *Id.*  The *Gonzaga* Court also clarified that both the "text and

structure of a statute" must show that "Congress intends to create new individual rights[.]"  *Id.* at

286.  "In sum, if Congress wishes to create new rights enforceable under § 1983, it must do so in

clear and unambiguous terms[.]"  *Id.* at 290.  Most recently, the Supreme Court has held that

Spending Clause legislation must furnish "clear notice" of the conditions imposed.  *Arlington*,

548 U.S. at 296, 298, and 300.

Plaintiffs have not identified clear and unambiguous rights-creating language requiring

Medicaid to provide, as opposed to pay, for mental/behavioral health services.  In Paragraph 64

of the Complaint, Plaintiffs cite to 42 U.S.C. §§ 1396a(a)(43) and 1396d(r) to support the

allegation that Medicaid has failed to provide services.  Section 1396a(a)(43) provides as

follows:

A State plan for **medical assistance** must -

* * *

(43) provide for -

(A) informing all persons in the State who are under the age of 21 and who have
been determined to be eligible for medical assistance described in section
1396d(a)(4)(B) of this title, of availability of early and periodic screening,
diagnostic, and treatment services [EPSDT] as described in section 1396d(r) of
this title and the need for age appropriate immunizations against
vaccine-preventable diseases

(B) providing or arranging for the provision of such screening services in all cases where they are requested,

(C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services, and

(D) reporting to the Secretary (in a uniform form and manner established by the Secretary, by age group and by basis of eligibility for medical assistance, and by not later than April 1 after the end of each fiscal year, beginning with fiscal year 1990) the following information . . . .

42 U.S.C. § 1396a(a)(43) (emphasis added).  Notably, Plaintiffs do not identify which of these provisions, if any, are at issue or how such provisions would require Medicaid itself to provide home- and community-based services.

Section 1396d(r) defines EPSDT "terms and services" to include services for screening, vision, dental, hearing, and

Such other necessary health care, diagnostic services, treatment, and other measures **described in subsection (a) of this section** to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.

42 U.S.C. § 1396d(r) (emphasis added).  This, in turn, brings us back to § 1396d(a) and the definition of "medical assistance."  Section 1396d(a) provides that "[t]he term 'medical assistance' means **payment** of part or all of the cost of the following care and services[.]"  *Id.* (emphasis added).  This section then defines *28 types of services* for which medical assistance is available.  42 U.S.C. § 1396d(a)(1)-(28).  The focus of the Medicaid Act, including the sections cited by Plaintiffs, is on payment for services.   Fifth Circuit precedent on this point is clear, "the definition of 'medical assistance,' as is used throughout the Medicaid Act, is clear from the text of the Act itself.  The Act explicitly provides that 'medical assistance' means 'payment' for

various medical services." *Equal Access for El Paso, Inc. v. Hawkins*, 562 F.3d 724, 727 (5th Cir. 2009); *Dickson*, 391 F.3d at 586, 588 ("'medical assistance' means payment for part or all of 'the cost of . . . [EPSDT] services'"); *see supra* at 16-17 for citations to other circuit courts expressing same.  The Complaint does not address Medicaid's obligation to pay for services; nor does the Complaint assert that any Plaintiff applied for or was denied payment for medically necessary services.  Moreover, the Complaint does not identify specific statutory provisions requiring Medicaid to provide actual services.  Consequently, Count I must be dismissed for failure to state a claim upon which relief can be granted.

Setting aside the medical assistance-as-payment-only issue, Plaintiffs fail to identify which, if any, of the 28 types of services Medicaid actually denied to any of the individual Plaintiffs.  In examining statutes like the Medicaid Act, the Supreme Court has placed a heightened burden on a plaintiff's pleading:

> It was incumbent upon respondents to identify with particularity the rights they claimed . . . .  Only when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights.

*Blessing*, 520 U.S. at 342 (discussing plaintiff's claims under Title IV-D of the Social Security Act); *Frazar v. Gilbert*, 300 F.3d 530, 543 (5th Cir. 2002) (following the level of specificity set out in *Blessing*), overruled on other grounds in *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004).  In *Blessing*, the plaintiffs sued Arizona's Director of the Department of Economic Security, complaining about the State's failure regarding its child support enforcement obligations and seeking systemic relief that focused on a structural overhaul.  *Id.* at 333-37.  The Supreme Court took particular notice of the plaintiffs' request for relief:

22

Respondents claimed that the State's systemic failures violated their federal rights under Title IV-D. Invoking 42 U.S.C. § 1983, they asked the District Court to grant them the following broad relief:

"Enter a declaratory judgment determining that operation of the Arizona Title IV-D program violates controlling, substantive provisions of federal law creating rights in plaintiffs and the class enforceable through an action permitted by 42 U.S.C. § 1983.

"Grant permanent (and as necessary and appropriate, interlocutory) injunctions prohibiting continued adherence to the aforesaid pattern and practices and requiring affirmative measures sufficient to achieve as well as sustain substantial compliance with federal law, throughout all programmatic operations at issue."

*Id.* at 337.  Examining the language of the requested relief, the Court was concerned with the lack of specific pleading:  "In prior cases, we have been able to determine whether or not a statute created a given right because the plaintiffs articulated, and lower courts evaluated, well-defined claims."  *Id.* at 342.  Ultimately, the Court concluded that seeking substantial compliance with broadly-phrased mandatory obligations did not identify an enforceable right.

Here, Plaintiffs assert that Medicaid is required to provide them a bundle of undefined services in a home- or community-based setting and attempt certification of a broad class.  Not only have Plaintiffs failed to distinguish *what specific services* have been denied *whom*, but also, Plaintiffs have failed to allege that they applied for and were denied services.  Further, Plaintiffs fail to identify the specific statutory language that purports to create particular rights in their favor.  As in *Blessing*, Plaintiffs request for declaratory and injunctive relief is broadly phrased, seeking sweeping enforcement of ill-defined services divorced from any statutory right.  Specifically, Plaintiffs ask this Court to:

2.     Declare unlawful Defendants' failure to comply with the mandates of the Medicaid Act, . . .

23

3.     Enter a preliminary and permanent injunction enjoining Defendants from subjecting members of the Plaintiff class to practices that violates their rights under the Medicaid Act, . . .

(Compl., p. 20).  Plaintiffs' claims for relief are not well-defined or differentiated; thus, Plaintiffs' allegations fail to break down "the complaint . . . into manageable analytic bites" necessary for Medicaid to be on notice and for this Court to ascertain what rights are at issue. Having failed to identify specific rights-creating language that would provide Medicaid clear notice of its obligations, Plaintiffs' claims against Medicaid under Count I must be dismissed.

**B.     The structure of the Medicaid Act does not create individual rights.**

In addition to scrutinizing the specific text, *Gonzaga* requires an examination of the structure of the Medicaid Act itself to discern whether Congress created individually enforceable rights. *Id.*, 536 U.S. at 286.  Setting aside Plaintiffs' failure to identify any specific rights-creating language in the text, the structure of the Medicaid Act reveals no rights-creating intention, especially rights that might be enforceable under § 1983.

Spending Clause legislation by its nature counsels against individually enforceable third-party rights.  After all, the Medicaid Act is an example of cooperative federalism - an agreement directly between the federal and state sovereigns.  While other entities benefit and have interests, the Medicaid Act is bound by the voluntary relationship between the federal and state governments.  The opening section of the Medicaid Act provides that it was enacted "[f]or the purpose of enabling each State . . . to furnish . . . medical assistance."  42 U.S.C. § 1396-1.[9]  This

---

[9]Section 1396-1 provides:

For the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care, there is hereby

stated purpose says nothing of individual rights or entitlements and highlights the fact that the

Act is an agreement between Congress and participating States.

The remedy for non-compliance with Spending Clause legislation concentrates on the

bilateral relationship between Congress and the States:

> In legislation enacted pursuant to the spending power, the typical remedy for state
> noncompliance with federally imposed conditions is not a private cause of action
> for noncompliance but rather action by the Federal Government to terminate funds
> to the State.

*Pennhurst I*, 451 U.S. at 28.  The Medicaid Act explicitly contains just such a remedy.  Section

1396c provides that if the Secretary of Health and Human Services finds that a state has failed to

substantially comply with its obligations, then the Secretary may withhold all or part of the

federal payments to the non-complying State.[10]  *Gonzaga* addressed this type of mechanism,

noting that where Congress empowered the Secretary of Education to "deal with violations" of

the respective act such provision counseled against finding individually enforceable rights.  536

U.S. at 289-90.  In directly addressing the Secretary's authority under the Medicaid Act, the First

---

authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance.

[10]Section 1396c provides:

If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this subchapter, finds--

(1) that the plan has been so changed that it no longer complies with the provisions of section 1396a of this title; or

(2) that in the administration of the plan there is a failure to comply substantially with any such provision;

the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply. Until he is so satisfied he shall make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failure).

Circuit, following *Gonzaga*, found that "the presence of an enforcement mechanism weighs against inferring private rights of action.  This is decidedly not a situation lacking an outside watchdog."  *Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 58 (1st Cir. 2004) (internal citation omitted).

The Medicaid Act also provides a remedy for third-party beneficiaries.  Section 1396a(a)(3) requires that a state plan must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied[.]"  Federal regulations implementing this provision demand evidentiary hearings, appeals, and due process.  42 C.F.R. §§ 431.200-431.250.  Accordingly, Medicaid acts pursuant to a detailed state law implementing this provision through administrative hearings *and* judicial review.  Miss. Code Ann. § 43-13-116(3), (e)(xvii).[11]  This raises the common sense question, if federal law mandates state administrative remedies is it not fair to expect and rely upon their use?  Enforcement by the Secretary and *mandatory* administrative procedures followed by available state judicial review of claims for medical assistance provide "clear notice" to the State of the remedies available and potential liability under the terms of the agreement, to the exclusion of other remedies.  *See Arlington Central*, 548 U.S. at 296.

In *Barnes v. Gorman*, the Supreme Court expanded the contract analogy used in Spending Clause legislation, noting:

---

[11]Section 43-13-116(3), (e)(xvii) provides, in pertinent part:

Administrative hearings shall be available to any . . . recipient who requests it because he or she believes the agency has erroneously taken action to deny, reduce, or terminate benefits.

***

The claimant is entitled to seek judicial review in a court of proper jurisdiction.

> When a federal-funds recipient violates conditions of Spending Clause legislation, the wrong done is the failure to provide what the contractual obligation requires; and that wrong is "made good" when the recipient *compensates* the Federal Government or a third-party beneficiary (as in this case) for the loss caused by that failure.

536 U.S. 181, 189 (2002). While third-party beneficiaries may be entitled to some form of compensation, such beneficiaries may be bound by the *mechanism* for determining compensation chosen by the contracting parties. For example, third-party beneficiaries may be bound by arbitration agreements. *See, e.g.*, *Graves v. BP America, Inc.*, 568 F.3d 221, 223 (5th Cir. 2009); *Adams v. Greenpoint Credit, LLC*, 943 So.2d 703, 708 (Miss. 2006). Similarly, third-party beneficiaries to the Medicaid Act should be bound by the administrative procedures provided therein. Plaintiffs should only be allowed to take advantage of the mechanisms identified in the Medicaid Act, enforcement via the Secretary or the administrative remedy. *See Pennhurst I*, 451 U.S. at 29 (noting on the issue of remedy that "[r]espondents relief may well be limited to enjoining the Federal Government from providing funds to the Commonwealth"); *Pharmaceutical Research and Mfrs. of America v. Walsh*, 538 U.S. 644, 675 (2003) (Scalia, J., concurring) ("I would reject petitioner's statutory claim on the ground that the remedy for the State's failure to comply with the obligations it has agreed to undertake under the Medicaid Act is set forth in the Act itself: termination of funding by the Secretary of the Department of Health and Human Services, see 42 U.S.C. § 1396c." (internal citations omitted)). Even so, the provision for a mandatory administrative remedy weighs against a finding of individually enforceable rights.

Whatever benefits eligible individuals may receive, the Medicaid Act does not characterize those interests as rights. This fact is also supported by case law. In *Harris v.*

*McRae*, the Supreme Court considered whether Congress' refusal to provide federal funds for medically necessary abortions left intact the States' duty under Medicaid to fund such procedures even where federal reimbursement was unavailable.  448 U.S. 297, 301 (1980).  The Supreme Court focused on the nature of Medicaid as a "program created . . . for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons."  *Id.*  After noting that "[t]he cornerstone of Medicaid is financial contribution by both the Federal Government and the participating State," the Supreme Court then held "if Congress chooses to withdraw federal funding for a particular service, a State is not obligated to continue to pay for that service as a condition of continued federal financial support of other services."  *Id.* at 308-09.  *Harris* highlights the fundamental purpose of Medicaid and was resolved, not by authoritative reference to the benefits or rights of eligible individuals, but to the elemental structure of the Act, i.e. the federal-state compact.  It seems wrong to suggest that Plaintiffs have an individually enforceable "right" when such can be destroyed by a mere refusal to fund the very service that would constitute the right.

In *Pennhurst I*, the Court, relying on *Harris*, drew a parallel between the Medicaid Act and the Developmentally Disabled Assistance and Bill of Rights Act:

> In sum, nothing suggests that Congress intended the Act to be something other than a typical funding statute.  Far from requiring the States to fund newly declared individual rights, the Act has a systematic focus, seeking to improve care to individuals by encouraging better state planning, coordination, and demonstration projects.  Much like the Medicaid statute considered in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the Act at issue here "was designed as a cooperative program of shared responsibilit[ies], not as a device for the Federal Government to compel a State to provide services that Congress itself is unwilling to fund."  *Id.*, at 309, 100 S.Ct., at 2684.

28

*Pennhurst I*, 451 U.S. at 22 (internal footnote omitted).  Recent amendments to the Medicaid Act confirm that the statute is not concerned with individual rights but focuses on the financial payment scheme between the Congress and participating States.  In 2005 Congress passed the Deficit Reduction Act (the "DRA"), which amended portions of the Medicaid Act.  DRA  §§ 6001-6203 , Pub. L. No. 109-171, 120 Stat. 4, 54-134 (2006).  The DRA made broad changes to Medicaid, including new provisions giving the States flexibility to institute premium coverage, cost sharing, and benefit packages.  *Id.*, 120 Stat. at 81-92.  Of particular relevance here, the DRA created "benchmark coverage" and "benchmark-equivalent coverage" benefit packages.  *Id.* at 88-92, codified at 42 U.S.C. § 1396u-7.

Benchmark coverage is statutorily identified, existing benefits packages, such as the "standard Blue Cross/Blue Shield preferred provider option" or a "health benefits coverage plan that is offered and generally available to State employees in the State involved."  42 U.S.C. § 1396u-7(b)(1)(A), (B).  Benchmark-equivalent coverage is coverage that includes basic services for five categories of benefits and that has "an aggregate actuarial value that is at least actuarially equivalent to one of the benchmark benefit packages . . . ."  42 U.S.C. § 1396u-7(b)(2)(A), (B).

The benchmark provisions allow the State to *require* eligible individuals to enroll in benchmark or benchmark-equivalent programs in order to receive benefits.  42 U.S.C. § 1396u-7(a)(1)(A) and (a)(2)(A).  The DRA amendments certify that Medicaid is, and is intended to be, a payment scheme, not a service provider.  Pursuant to the DRA amendments, Medicaid essentially may act to subsidize or pay premiums to coverage entities such as Blue Cross/Blue Shield or a state health plan.  42 U.S.C. § 1396u-7(a)(1)(D).  Medicaid is thereby further removed from beneficiaries.  Indeed, eligible individuals would receive their benefits from the benchmark

coverage, not Medicaid.  Whatever benefit or interest individuals might have relating to Medicaid would be purely monetary.  Beneficiaries would have to look to the benchmark coverage, in the first instance, for even assurance of services.

The DRA amendments cannot be understated.  They reveal the pure financial relationship between Congress and a participating State.  Money passes from the federal government to the States and then to administrators and service providers for the benefit of individual, state, and national health.  Whatever benefits or interests eligible individuals may have, the DRA amendments show that the Medicaid Act focuses on the *use of funds* to address systemic issues by attempting to induce others to deliver care.  *See Pennhurst I*, 451 U.S. at 22 (quoting *Harris*, 448 U.S. at 309).  Simply put, the Medicaid Act, examined in light of the DRA amendments, does not provide clear notice of individual rights enforceable under § 1983.

Despite its complexity, the Medicaid Act has a singular focus, financial assistance for those otherwise unable to afford adequate health care.  Accordingly, the Medicaid Act is structured to regulate and deliver payments to those that provide or receive health care services.  Judge Posner, writing for the Seventh Circuit, put the distinction between payment and service bluntly:  "Medicaid is a payment scheme, not a scheme for state-provided medical assistance, as through state-owned hospitals."  *Bruggeman*, 324 F.3d at 910.

As noted by the Fifth Circuit, "[w]e are forced by *Gonzaga* to abjure the notion that anything short of an unambiguously conferred private individual 'right,' rather than the broader or vaguer 'benefits' or 'interests,' may be enforced under § 1983."  *Equal Access*, 509 F.3d at 704.  Medicaid contends that the Act does not provide for individually enforceable rights at all.  Assuredly, neither the text nor the structure of the Act creates a private right of action premised

on a demand that Medicaid provide services to Plaintiffs.  Consequently, Plaintiffs' claims

against Medicaid under Count I must be dismissed.

### C.   Section 1983 is not available to secure the rights Plaintiffs assert.

Medicaid submits that Plaintiffs cannot use § 1983 as a means of enforcing their asserted

rights under the Medicaid Act because third-party beneficiaries (Plaintiffs' analogue) could not

sue to enforce contracts in 1871 when Congress passed § 1983.  Section 1983 states, in relevant

part:

> Every person who, under color of any statute, ordinance, or regulation, custom, or
> usage, of any state . . . subjects, or causes to be subjected, any citizen of the
> United States . . . to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  In his concurring opinion in *Blessing v. Freestone*, Justice Scalia, joined by

Justice Kennedy, analogized beneficiaries of Spending Clause legislation to third-party

beneficiaries to a contract and opined as follows:

> Until relatively recent times, the third-party beneficiary was generally regarded as
> a stranger to the contract, and could not sue upon it; that is to say, . . . the only
> person who could enforce the promise in court was the other party to the contract,
> A. See 1 W. Story, A Treatise on the Law of Contracts 549-550 (4th ed. 1856).
> This appears to have been the law at the time § 1983 was enacted.  If so, the
> ability of persons in respondents' situation to compel a State to make good on its
> promise to the Federal Government was not a "righ[t] ... secured by the ... laws"
> under § 1983.  While it is of course true that newly enacted laws are automatically
> embraced within § 1983, it does not follow that the question of what rights those
> new laws (or, for that matter, old laws) secure is to be determined according to
> modern notions rather than according to the understanding of § 1983 when it was
> enacted.  Allowing third-party beneficiaries of commitments to the Federal
> Government to sue is certainly a vast expansion.

*Blessing*, 520 U.S. at 349-350 (internal citation omitted).  In a subsequent concurrence, Justice

Thomas echoed these concerns stating "[t]his contract analogy raises serious questions as to

31

whether third parties may sue to enforce Spending Clause legislation-through pre-emption or otherwise." *Pharmaceutical Research and Mfrs. of America v. Walsh*, 538 U.S. 644, 683 (2003) (citing *Blessing*, 520 U.S. at 349-350 (Scalia, J., concurring)).

The willingness of the Supreme Court to analogize Spending Clause legislation to a contract is well-established. *E.g.*, *Barnes*, 536 U.S. at 186-89. The question is a legitimate one: If third-party beneficiaries had no rights in 1871 to sue on a contract, can § 1983 be used to enforce rights asserted by beneficiaries of Spending Clause legislation, like the Medicaid Act? Medicaid submits that § 1983 is not available to these Plaintiffs as a means of enforcing benefits allegedly derived from the Medicaid Act.

The Supreme Court routinely looks to the law as it existed at the time of § 1983's adoption. In *Wilson v. Garcia*, the Court had to determine the most appropriate state statute of limitations to apply to claims enforceable under § 1983. *Wilson*, 471 U.S. 261, 262 (1985). In reasoning that all § 1983 claims should be treated as personal injury torts, the Supreme Court explored the genesis of § 1983, noting that the Civil Rights Act of 1871 was a response to the "violence and deception in the South, fomented by the Ku Klux Klan" and was Congress' attempt "to restore peace and justice through the subtle power of civil enforcement." *Id.* at 276-77. The Supreme Court unquestionably relied upon the law and understanding of Congress in 1871 to characterize § 1983:

> The atrocities that concerned Congress in 1871 plainly sounded in tort. Relying on this premise we have found tort analogies compelling in establishing the elements of a cause of action under § 1983 and in identifying the immunities available to defendants.

* * *

32

> Among the potential analogies, Congress unquestionably would have considered the remedies established in the Civil Rights Act to be more analogous to tort claims for personal injury than, for example, to claims for damages to property or breach of contract.

*Id.* at 277 (internal citations omitted).  Based in large part on this history, the Supreme Court held that all § 1983 claims are best characterized as personal injury actions and subject to each State's single most analogous statute of limitations.  *Id.* at 279-80.

The Supreme Court similarly relied upon the understanding of Congress in 1871 when the Court considered whether the term "person" as used in § 1983 included the State.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65-70 (1989).  In *Will*, the Supreme Court looked to Congress' understanding of a State's sovereign immunity when it enacted the Civil Rights Act of 1871 to determine whether Congress intended the term "person" to include the States:

> Our conclusion is further supported by our holdings that in enacting § 1983, Congress did not intend to override well-established immunities or defenses under the common law.  "One important assumption underlying the Court's decisions in this area is that members of the 42d Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary." . . .  The doctrine of sovereign immunity was a familiar doctrine at common law.  . . .  We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent.

*Will*, 491 U.S. at 67 (internal citations omitted).  The Court's willingness to examine common-law doctrines at the time of § 1983's passage is relevant in considering whether third-party beneficiaries should allowed to use § 1983 to enforce Spending Clause legislation.

In a pair of § 1983 cases addressing the unconstitutional administration of state tax laws, the Supreme Court relied on background principles of comity that predated enactment of § 1983 to find that Congress did not authorize such actions in passing § 1983.  *National Private Truck*

*Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582, 587 (1995) ("[T]he background

presumption that federal law generally will not interfere with administration of state taxes leads

us to conclude that Congress did not authorize injunctive or declaratory relief under § 1983 in

state tax cases when there is an adequate remedy at law."); *Fair Assessment in Real Estate Ass'n,*

*Inc. v. McNary*, 454 U.S. 100, 116 (1981) ("This case is therefore controlled by principles

articulated even before enactment of § 1983[.] . . . [W]e hold that taxpayers are barred by the

principle of comity from asserting § 1983 actions against the validity of state tax systems in

federal courts.").  As shown herein, the Supreme Court routinely relies upon the state of the law

at the time Congress passed § 1983 to determine the availability of that statutory remedy.

When § 1983 was passed, third-party beneficiaries could not sue to enforce a contract.

*See Blessing*, 520 U.S. at 349-50 (Scalia, J., concurring) (stating that it "appears to have been the

law at the time § 1983 was enacted" that "the third-party beneficiary was generally regarded as a

stranger to the contract, and could not sue upon it"); *Westside Mothers v. Haveman*, 133 F. Supp.

2d 549, 579 (E.D. Mich. 2001) ("At a minimum, the number of sources, if not the weight of such

authorities, appears to support Michigan's position that third-party donee beneficiaries could not

sue the contracting parties in 1871.") (citing *Second Nat'l Bank v. Grand Lodge*, 98 U.S. 123,

124-24, 25 L.Ed. 75 (1878) (recognizing "the general rule that privity of contract is required" to

support an action to enforce a contract); K. Teeven, *A History of the Anglo-American Common*

*Law of Contract* 230 (1990) (explaining that "the rights of donee beneficiaries were not clearly

established until *Seaver v. Ransom* (1918).");  C. Langdell, *A Summary of the Law of Contracts*,

79 (2d ed. 1880) (noting that in the 1870s, the recognized rule was "that a person for whose

benefit a promise was made, if not related to the promisee, could not sue upon the promise"); 1

W. Story, *A Treatise on the Law of Contracts* 509 (M. Bigelow ed. 1874) (noting "the tendency of the [American] courts" to hold that "no stranger to the consideration can take advantage of a contract, though made for his benefit")).[12]

As one source points out, in England it was long established that a third-party beneficiary cannot sue to enforce a contract. L. Simpson, *Simpson on Contracts* 300 (1954). Professor Simpson notes that New York was the first jurisdiction to break with the English rule when it held in 1859 "that where a promise is 'made to one for the benefit of another, he for whose benefit it is made may bring an action for its breach.'" *Id.* at 301 (quoting *Lawrence v. Fox*, 20 N.Y. 268 (1859)). However, a subsequent decision of the New York court limited *Lawrence* to its facts, where "the promisee was a debtor of the third party." *Id.* at 302 (discussing *Vrooman v. Turner*, 69 N.Y. 280 (1877). According to Professor Simpson, it was not until 1918, with the court's decision in *Seaver v. Ransome*, 224 N.Y. 233 (1918), that the issue was settled in New York that both creditor and donee beneficiaries could sue to enforce a contract. *Id.* at 303 (discussing *Seaver*); *accord* Teeven, *A History of the Anglo-American Common Law of Contract* 230 (explaining that "the rights of donee beneficiaries were not clearly established until *Seaver v. Ransom* (1918).").

Medicaid submits that this Court should consider the argument above and find that § 1983 is not available to enforce the Medicaid Act. Although not directly set forth in case law, other considerations should inform this Court's decision. First, it is difficult to comprehend how federal law necessarily "secures" the rights Plaintiffs' claim. The Medicaid Act only becomes

---

[12]The district court was overruled by the Sixth Circuit in *Westside Mothers v. Haveman*, 289 F.3d 852 (6th Cir. 2002). Although the Sixth Circuit rejected most of the lower court's ruling, the Court did not appear to engage the present argument; nor has Medicaid found any other Circuit Court directly addressing the issue.

binding once the State voluntarily accepts the Acts' conditions and the federal government's money.  The Act is not mandatory, and the State may withdraw from participation.  Additionally, as *Harris v. McRae* shows, Plaintiffs' "rights" are not secured where Congress chooses not to fund a particular benefit, even though the language of the Medicaid Act may appear mandatory. *Harris*, 448 U.S. 297 discussed *supra* at 27-28.  Second, it seems odd that state officials are acting "under the color of state law" anymore than they would be acting under the color of federal law, for which no § 1983 cause would exist.  When the State implements the Medicaid Act, it is implementing the terms of an agreement.  When the State acts pursuant to its State Medicaid Plan, it is acting with the approval of the federal government.  These considerations serve to highlight the distinct, voluntary nature of conditional Spending Clause legislation. While such may be federal law, it is not necessarily true that § 1983 should be used to enforce its terms.

## CONCLUSION

For the reasons stated herein, Governor Haley Barbour and Executive Director Robert Robinson ask this Court to enter an order dismissing Count I of the Complaint.

Respectfully submitted,

FOR DEFENDANT GOVERNOR HALEY BARBOUR, in his official capacity

BY:    /s Roger Googe
           ROGER GOOGE, MS BAR NO. 4903
           SPECIAL ASSISTANT ATTORNEY GENERAL


FOR DEFENDANT ROBERT L. ROBINSON, in his official capacity as Director of the Mississippi Division of Medicaid

36

                                    BY:    /s Shawn S. Shurden
                                           _____
                                           SHAWN S. SHURDEN, MS BAR NO. 99678
                                           WILSON MINOR, MS BAR NO. 102663
                                           HAROLD E. PIZZETTA III, MS BAR NO. 99867
                                           MARY JO WOODS, MS BAR NO. 10468
                                           SPECIAL ASSISTANT ATTORNEYS GENERAL

Office of the Attorney General
Post Office Box 220
Jackson, Mississippi  39205
Telephone No. (601) 359-3680
Facsimile No. (601) 359-2003
sshur@ago.state.ms.us
rgoog@ago.state.ms.us

## <u>CERTIFICATE OF SERVICE</u>

I, Shawn S. Shurden, Special Assistant Attorney General of the State of Mississippi, do hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Sheila A. Bedi
sheila.a.bedi@gmail.com, sbedi@splcenter.org, mstoddard@splcenter.org

Vanessa Judith Carroll
vcarroll@splcenter.org, vjcarroll@gmail.com

Robert B. McDuff, Esq.
RBM@McDuffLaw.com

Shirim Nothenberg
snothenberg@childrensrights.org

I certify that I have hereby mailed, via United States Postal Service, first class postage prepaid, a true and correct copy of the foregoing in the above-styled and numbered cause to the following non-ECF participant:

Ira Burnim, Esq.
The Bazelon Center for Mental Health Law
1101 15th Street, North West, Suite 1212
Washington, D.C. 20005

**THIS** the 27th day of May, 2010.

/s Shawn S. Shurden
SHAWN S. SHURDEN