

**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

### DEC 22 2011

The Honorable Haley R. Barbour
Governor
State of Mississippi
Walter Sillers Building, 19th Floor
550 High Street
Jackson, MS  39021

> Re:   United States' Investigation of the State of Mississippi's Service System for
> Persons with Mental Illness and Developmental Disabilities

Dear Governor Barbour:

The United States has completed its investigation of the State of Mississippi's system for delivering services and supports to thousands of persons with mental illness and/or developmental disabilities[1] ("DD"). This letter is a report of our findings. Our review reveals that the State of Mississippi has failed to meet its obligations under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, and its implementing regulations, 28 C.F.R. pt. 35, by unnecessarily institutionalizing persons with mental illness or DD in public and private facilities and failing to ensure that they are offered a meaningful opportunity to live in integrated community settings consistent with their needs. The United States looks forward to working with the State of Mississippi to develop an appropriate remedy to resolve these concerns.

During our investigation, we assessed the State's compliance with the ADA, as interpreted in Olmstead v. L.C., 527 U.S. 581 (1999), requiring that individuals with disabilities, including mental illness and developmental disabilities, receive services and supports in the most integrated setting appropriate to their needs. The Department has authority to seek a remedy for violations of Title II of the ADA, 42 U.S.C. § 12133; 28 C.F.R. §§ 35.170-174, 190(e). We also initiated our investigation pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, which authorizes the United States to seek a remedy for conduct that violates the constitutional or federal statutory rights of individuals with disabilities who are in public institutions. Under CRIPA, we assessed the State's compliance with other federal laws,

---

[1] In this letter, we use the global term "developmental disabilities" or "DD" to include people with an intellectual and/or developmental disability, including, but not limited to, mental retardation, cerebral palsy, Down syndrome, autism, as well as acquired brain injury.

including the Medicaid portion of the Social Security Act, and its Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") provisions, 42 U.S.C. §§ 1396 et seq and the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. In our investigation, we did not assess or reach conclusions about the quality of clinical care in the various facilities and programs, focusing instead on potential issues related to the unnecessary segregation of people with disabilities.

In accordance with the statutory requirements under CRIPA, 42 U.S.C. § 1997b(a), the implementing regulations of the ADA, 28 C.F.R. § 35.172(a), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-1, this letter provides notice of the State's failure to comply with federal law, most notably, by failing to provide services to individuals with mental illness and/or developmental disabilities in the most integrated setting as required by the ADA. We have also set forth in this letter the steps Mississippi needs to take to meet its obligations under federal law. By implementing the remedies below, the State will correct identified ADA and other unlawful deficiencies, fulfill its commitment to individuals with disabilities, and spend taxpayer dollars far more effectively.

We would like to express our appreciation to the State for its cooperation. We would like to acknowledge the consistent hospitality, courtesy, and professionalism shown to us by State officials and staff at all levels and at all times. It was evident that State personnel regularly demonstrated true concern for and commitment to the people they serve. It was a pleasure for us to meet the individual board members on the Mississippi Board of Mental Health, led by Board Chair Robert Landrum. We would also like to extend a special thanks to DMH Executive Director LeGrand for repeatedly taking time out of his busy schedule to meet with us, and for generally facilitating our review. We hope to continue to work with the State in the same cooperative and collaborative manner as we work to resolve our findings.

## I.     SUMMARY OF FINDINGS AND CONCLUSIONS

"I'm really wanting to get out." These words were spoken to DOJ civil rights investigators by a person confined to a Mississippi facility. They illustrate the urgency of our findings. Thousands of Mississippi residents with mental illness or developmental disabilities are institutionalized. While confined in these institutions, they are segregated from non-disabled persons and lead lives of limited choice or independence. They are deprived of meaningful opportunities to choose friends, participate in employment, or make choices about activities, food or living arrangements. In the words of the Supreme Court: "Unjustified isolation ... is properly regarded as discrimination based on disability." Olmstead, 527 U.S. at 597.

We conclude that the State of Mississippi fails to provide services to qualified individuals with disabilities, including mental illness and developmental disabilities, in the most integrated settings appropriate to their needs, in violation of the ADA. This has led to the needless and prolonged institutionalization of adults and children with disabilities who could be served in more integrated settings in the community with adequate services and supports. Further, systemic failures in the State's system place qualified individuals with disabilities at risk of unnecessary institutionalization now and going forward.

Our specific findings include:

- Sweeping, powerful trends over the past half-century have prompted other states to move away from serving people with disabilities in large, outdated, segregated, institutions toward more individualized, independent, effective care in integrated community settings. These changes have enabled people with disabilities to live rich lives alongside their nondisabled peers and family members. Yet Mississippi continues to over-rely on public and private institutions. As a result, Mississippi's service system for persons with disabilities is the most institution-reliant system in the United States. Mississippi is consistently ranked as one of the worst, and often the worst, on measures of whether persons with disabilities are being served in integrated settings. Mississippi also spends more money proportionally on institutional care, and less on community services, than any other state.

- The State is still engaged in the process of opening new and expensive institutions to serve persons with disabilities. This construction runs counter to well-established professional and legal dictates, including those set forth in the ADA, that persons are entitled to receive services in the most integrated settings appropriate to their needs.

- In spite of recent commitments to build community capacity and better serve persons with disabilities in integrated community settings, the State has done little to change the institutional status quo. In fact, Mississippi is the only jurisdiction in the country that serves more than 25 percent of the people with DD in its system in large state institutions.

- Individual's treatment plans capture their hopes and dreams to live in the community and have meaningful days, just like people without disabilities. Nonetheless, the State fails to make community life a reality for all but a few individuals.

- The State has never fully funded or implemented its own Olmstead Plan to come into compliance with the legal mandates of the ADA and the Supreme Court's Olmstead opinion.

- The State has taken insufficient steps to reallocate existing resources for mental health and developmental disabilities. Mississippi has not taken full advantage of Medicaid support for community services such as the Home and Community-Based Services Waiver program for people with DD and state-plan services for people with mental illness. These programs would facilitate the transition of persons with disabilities to community settings with ongoing services supported by a generous federal contribution.

- In spite of potential cost savings, and in spite of a recurring multi-million dollar annual deficit, Mississippi has continued to fund expensive institutional care, even though less costly and more effective alternatives exist in the community. In recent years, Mississippi spent 55 percent of its mental health budget on institutional care, while nationwide states spent an average of 27 percent of their budgets on institutions. Similarly, Mississippi spent 68 percent of its DD budget on institutional settings, while the national average was 33 percent.

- It is far more costly to serve a person with disabilities in an institutional setting in Mississippi than it is to serve the person in an integrated community setting. It costs about $110,000 per year to serve a person in one of the State's DD facilities and only about $27,000 per year to serve a person with DD in the community – a cost savings of about $83,000 per person. Mississippi could serve roughly four persons with DD in the community for every one it serves in its institutions.

- It costs about $150,000 per year to serve a person in one of the State's mental health institutions. Mississippi must pay for these institutional services with state-only dollars because the 74% matching contribution from the federal government through Medicaid is unavailable for services delivered in mental health institutions. Serving a person with mental illness in the community costs as little as $44,500 per year and enables the State to pay for the majority of those services with federal Medicaid dollars. Mississippi could serve roughly four persons with mental illness in the community for every one it serves in its institutions.

- The State's reliance on institutional care harms residents of institutions. Not only are individuals segregated and denied the opportunity to participate in the everyday activities of community life, but they are subject to stigma and at risk of physical harm. Their institutionalization also keeps them from their families. They are often required to live hours away from their friends and families.

- There is inadequate community capacity in Mississippi to meet the needs of persons with mental illness and developmental disabilities, including a lack of intensive community supports like Assertive Community Treatment ("ACT"), crisis services, waiver services, peer supports, and safe, affordable, and stable housing. This lack of community capacity has led to unnecessary and prolonged institutionalization and an increased risk of unnecessary institutionalization for persons in need of community services, in violation of the ADA's integration mandate.

- The State's longstanding failure to develop sufficient community services has forced families struggling to support loved ones with disabilities to choose between living without needed services and placing loved ones in institutional care. The inadequate community services continue to serve as a significant barrier to the discharge of individuals from the State's institutions.

- Mississippi's lack of community capacity contributes to negative outcomes in the community where individuals with disabilities are forced to obtain needed services at inappropriate and costly venues, such as emergency rooms or institutional settings. For some, lack of community services can lead to homelessness and incarceration.

Reliance on unnecessary institutional care both violates the civil rights of people with disabilities and incurs unnecessary expense. Community integration with appropriate services and supports will permit the State to support people with disabilities in settings appropriate to their needs in a more cost-effective manner.

## II.    INVESTIGATION

On February 25, 2011, pursuant to the ADA and CRIPA, we notified you that we were initiating an investigation of the State's mental health and DD systems.  Over the course of the next several months, we conducted visits to programs owned, operated, and/or funded by the State.

- In May and June, we met with State leadership, including Department of Mental Health ("DMH") Executive Director, Edwin C. LeGrand, III; we conducted a walk-through tour of the Mississippi State Hospital and the Hudspeth Regional Center in Whitfield; we met with officials at the Region 8 Community Mental Health Center ("CMHC") in Brandon; and we visited some community programs in and around Jackson that are under the administrative control of the State.

- In August, accompanied by a team of experts in serving children and adults in integrated community settings, we conducted in-depth onsite reviews at a number of mental health and DD facilities throughout the state, including:  the East Mississippi State Hospital in Meridian, the South Mississippi State Hospital in Purvis, the Crisis Stabilization Unit in Brookhaven, the Specialized Treatment Facility in Gulfport, the Crisis Stabilization Unit in Laurel, the Region 8 CMHC, and the Region 12 CMHC in Hattiesburg.  We also toured several DD facilities and programs, including the Boswell Regional Center in Magee, the Mississippi Adolescent Center in Brookhaven, the Ellisville State School, and Hudspeth, as well as several off-campus and community residences.  Consistent with our commitment to provide technical assistance where appropriate and to conduct a transparent investigation, we facilitated an exit conference in which our expert consultants shared their initial, preliminary impressions and conclusions with State officials, including top DMH leadership.

- In September, we met with the executive directors from a number of CMHCs throughout the state and with leadership within the Mississippi Division of Medicaid.  We attended a Board of Mental Health meeting and met all of the board members in attendance.

- In November and December, we met with leadership of the Region 6 CMHC in Greenwood, visited the North Mississippi Regional Center in Oxford, met with friends and family organizations at North Mississippi Regional Center and at Hudspeth, and met with officials from the State's central office in Jackson.

- In conducting our onsite visits, we interviewed administrators, professionals, direct care and other staff, as well as the individuals who were receiving the services and supports in the State's system.  Before, during, and after our visits, we reviewed a wide range of documents, including statewide plans and reports, individual support plans, discharge plans, policies and procedures, incident reports, and health care and mental health care records.

- Throughout the investigation we met with and interviewed advocates and service providers. We visited private providers and facilities and met with members of local and regional public interest and advocacy organizations.

- Our investigation was also informed by interviews with people with disabilities and their families. Our team and expert consultants spoke with individuals while visiting facilities, at two open community forums, at two friends-and-family meetings at DD facilities, in phone calls, and on visits to community providers. These meetings and interviews provided valuable information about gaps in the DD and mental health service systems and about the challenges that persons being served by those systems face. These contacts also informed us of the hopes, aspirations and worries of people with disabilities and their families. People with disabilities and their family members expressed the view that Mississippi's system needs to be transformed to enable all people with disabilities the opportunity to live in the community, regardless of the nature of their needs. Many people told us they now have no real choice but institutional care.

## III.   BACKGROUND

### A. Mississippi Board of Mental Health and the Department of Mental Health

About 40 years ago, the Mississippi Legislature created DMH, making it responsible for services related to mental health, substance abuse, and developmental disabilities that had been scattered among various other offices throughout state government. The Mississippi Board of Mental Health is DMH's governing body; the board is composed of nine members appointed by you and confirmed by the State Senate. The Board has appointed Mr. LeGrand as the current Executive Director of DMH; his primary responsibility is to head the DMH Central Office and to oversee the operations of various facilities and off-campus programs for individuals with disabilities throughout the state.

### B. The State's System for Serving Persons with Developmental Disabilities

The State, through DMH, directly operates six institutions for persons with DD: the South Mississippi Regional Center in Long Beach, Ellisville State School regional center, the Boswell, Hudspeth, and North Mississippi regional centers, and the Mississippi Adolescent Center. All of these DD facilities offer residential services; the regional centers also offer off-campus residential services, including a total of about 60 ten-bed facilities, operated by the nearby State institutions and staffed with employees on the institutions' payroll. These large off-campus group homes are certified as Intermediate Care Facilities ("ICFs"), just like their larger administrative-parent institutions.

As of October 19, 2011, there were 1,959 persons with a developmental disability living at State-run institutional facilities or nearby off-campus ICFs.[2] Mississippi licenses six additional private facilities operating 689 more ICF beds, which receive State funding through Medicaid and are part of the State's DD system. The State also offers some community services and supports through its "Intellectual Disabilities/Developmental Disabilities" Medicaid Home and Community-Based Services Waiver ("IDD waiver"), authorized pursuant to § 1915(c) of the Social Security Act's Medicaid program. Services offered under the waiver include support coordination, attendant care services, pre-vocational services, day habilitation, in-home nursing respite, supported employment, supervised residential habilitation, in-home companion respite, supported residential habilitation, and various therapies. In FY 2011, the State funded 1,817 IDD waiver slots at an annual average cost of about $27,000 per slot. There were also over 1,900 persons on the IDD waiver waitlist.[3]

In addition, DMH certifies and provides funding to organizations to offer community services and supports to persons with DD not receiving waiver services, including: case management, early intervention services, work activity centers, day support, supported employment, and community living supports.

C.   The State's System for Serving Persons with Mental Illness

The State, through DMH, directly operates four psychiatric hospitals: the North Mississippi State Hospital in Tupelo, Mississippi State Hospital, East Mississippi State Hospital, and South Mississippi State Hospital. DMH also operates the Central Mississippi Residential Center in Newton, to provide transitional services for adults with serious mental illness, and the Specialized Treatment Facility for adolescents with mental health issues. All six of these mental health facilities offer inpatient, residential services; two psychiatric hospitals offer some off-campus residential services.

A large number of persons with mental illness receive mental health services at or through one of the State's mental health institutions. An average total of about 900 persons resided in one of the six State mental health institutions at any given time in the past fiscal year.[4]

---

[2] On October 19, 2011, the ICF census at each facility was: Ellisville – 606; North Mississippi – 485; Hudspeth – 402; South Mississippi – 240; Boswell – 198; and the Mississippi Adolescent Center – 28.

[3] This federal waiver program is authorized by § 1915(c) of the Social Security Act and permits states to furnish an array of home and community-based services that assist Medicaid beneficiaries to live in the community and avoid institutionalization. The federal government gives states broad discretion to design their waivers to address the individualized needs of the waivers' target population. A similar arrangement exists with regard to funding community services for persons with mental illness through state-plan service programs.

[4] Based on figures through June 30, 2011, the average daily census totals at the mental health facilities for FY 2011 were: Mississippi State Hospital – 401; East Mississippi State Hospital – 311; North Mississippi State Hospital – 49; South Mississippi State Hospital – 44; Central Mississippi Residential Center (including the crisis stabilization component) – 55; and the

However, the 900 people in the State's psychiatric hospitals at any given time do not paint a complete picture of the State's reliance on psychiatric institutions; many more than 900 individuals rely on services in the State's psychiatric institutions over the course of a year. Using conservative figures, in FY 2011, there were 4,320 total admissions to the State's six mental health facilities.[5]

There are about 540 additional licensed beds for people with mental health needs located in two private psychiatric hospitals, 14 hospital-based psychiatric facilities, and 298 private psychiatric residential treatment facility ("PRTF") beds for youth throughout the state, which receive State funding and are part of its mental health system. The State places children in PRTF beds in Mississippi and contracts for additional beds at three more PRTFs outside the State. In addition, the State certifies and funds organizations offering services to children with mental illness or emotional disorders and for persons with substance abuse needs.

The State, through DMH, also exercises umbrella authority over the network of CMHCs located throughout the state. The CMHCs are autonomous public bodies governed by regional commissions. There are 15 CMHC regions throughout the state. The CMHCs are the primary service providers with whom DMH contracts to furnish a range of community-based mental health and substance abuse services to persons with disabilities; some CMHCs also provide DD services. DMH is responsible for certifying, monitoring, and assisting the CMHCs. Each CMHC either operates or has access to a neighboring CMHC's 16-bed Crisis Intervention Center ("CIC") to provide stabilization and treatment services to persons who are in psychiatric crisis. The CICs are in Laurel, Brookhaven, Corinth, Batesville, Newton, Cleveland, and Grenada.

D.   Cost of Providing Services to Individuals with Disabilities in Mississippi

As discussed in greater detail below, State figures reveal that the average cost of institutionalizing a person in one of the State's DD facilities (the five DD regional centers and the Mississippi Adolescent Center) is approximately $110,000 per year. In contrast to the high institutional expense, the FY 2011 cost of serving a person with DD in the community through the IDD waiver is approximately $27,000 per year. Given this, Mississippi can serve roughly four people with DD in the community for each person served in one of its institutional facilities.

---

Specialized Treatment Facility – 40. The totals in this section only include residential services offered on the adult and adolescent psychiatric units at the Mississippi State Hospital and the East Mississippi State Hospital.

[5] FY 2011 admissions were:  Mississippi State Hospital – 1,650; East Mississippi State Hospital – 1,095; North Mississippi State Hospital – 526; South Mississippi State Hospital – 546; Central Mississippi Residential Center (including the crisis stabilization component) – 428; and the Specialized Treatment Facility – 75.

The average cost of institutionalizing a person in one of the State's mental health facilities is approximately $150,000 per year.[6] The State has estimated that serving an individual with mental illness and complex needs in the community through ACT costs about $36,500 per year, and that the cost of serving children with mental illness in the community through the Mississippi Youth Programs Around the Clock ("MYPAC") program is about $28,000 per year. Adding in the cost of supportive housing and housing supports still only increases the community mental health totals to between $44,500 and $61,500 per year. Moreover, many of these intensive community supports are Medicaid-reimbursable, so the State would share the cost with the federal government, while institutional care for individuals with mental illness is borne entirely by the State.[7] Thus, even allowing for additional costs associated with housing and other supports, the community cost remains significantly less than the institutional cost. Taking into account the federal contribution, the State could serve more than four people with mental illness in the community for each person served in one of its institutions.

E.  Individual and Family Impacts of Institutionalization

Undue segregation causes harm to the individuals who are unnecessarily institutionalized. See Olmstead, 527 U.S. at 601. Life in an institution leads not only to stigma and isolation, but also to regression, increased negative behaviors, learned helplessness, and physical harm.[8] See Marlo M. v. Cansler, 679 F. Supp.2d 638 (E.D.N.C. 2010) (finding unnecessary institutionalization leads to regressive consequences that cause irreparable harm); Long v. Benson, 2010 WL 2500349 (11th Cir. Jun 22, 2010) (affirming district court's grant of preliminary injunction based on irreparable injury of unnecessary institutionalization); Disability Advocates, Inc. v. Paterson,, 653 F. Supp.2d 184, 320 (E.D.N.Y. 2009). Large group settings serving many people with disabilities, including behavioral issues, create a fertile environment for individuals to learn maladaptive behaviors. These settings also limit choice in daily life

---

[6] This estimate is based on services at on the receiving, continued treatment, and adolescent units at the State's four psychiatric hospitals, and on the cost of services at the Central Mississippi Residential Center, and the Specialized Treatment Facility.

[7] For persons with DD, both institution-based services and community care are funded through Medicaid, with a combination of state and federal dollars; in Mississippi, the State enjoys a generous Medicaid match, in which the federal government contributes about three dollars for each state dollar of funding. While institutional DD services are eligible for this federal financial contribution, the cost to serve a person in a mental health institution is borne by the State alone, with no federal matching contribution.

[8] We understand that some parents are concerned about safety and quality of care in community settings. However, history has shown that, in addition to the inherent harm of unjustified isolation, individuals regularly suffer injuries and abuse in institutions. The best way to ensure safety in any setting is to develop and implement a strong quality assurance process whereby professionals regularly review and assess safety, treatment, and services, implementing corrective action whenever necessary. Any remedial plans to address the violations we found in this investigation must include the development of a robust quality assurance system for all settings.

regarding questions as basic as when to wake up, what to eat, who to live with, and how to spend one's day. Without choice, independence, and interaction with nondisabled peers, individuals do not realize their abilities.

Children are especially harmed by placement in institutions, as they learn best from positive models in small family settings. When children are placed in institutional settings, they, instead, tend to learn negative behaviors from peers in the institution. Attending schools with nondisabled peers is also a central component of children's socialization and development, and the children in institutions rarely attend local schools with their nondisabled peers.

Families are also harmed when their loved ones are placed in institutional settings. Often, the institutions are far from home and it is difficult to visit regularly and maintain a close relationship with the individual who is institutionalized. One parent wrote to us of her dream that her children could one day be closer to home, "I am 79 years old and, due to my health, I am rarely able to visit them. I pray you can help in having them placed closer to home." Parents also shared with us how difficult it was to place their children in institutions when they felt support did not exist for them in the community. Unnecessary institutionalization harms both the individual who is placed and those who love that person.

## IV. FINDINGS AND CONCLUSIONS

We conclude that Mississippi fails to provide services to qualified individuals with disabilities, including mental illness and developmental disabilities, in the most integrated setting appropriate to their needs as required by the ADA.

### A. The ADA Requires States to Serve Individuals in the Most Integrated Settings Appropriate

In enacting the ADA in 1990, Congress set out a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1). Congress found that "society has tended to isolate and segregate individuals with disabilities," that this is a form of discrimination against individuals with disabilities, and that this continues to be a "serious and pervasive problem." 42 U.S.C. § 12101(a)(2).[9] Congress found that discrimination against individuals with disabilities often exists in such critical areas as institutionalization, housing, public accommodations, health services, access to public services, and employment. 42 U.S.C. § 12101(a)(3). Congress emphasized that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full

---

[9] Nearly 20 years before enacting the ADA, Congress recognized that society historically had discriminated against people with disabilities by unnecessarily segregating them from their families and communities, and in response, enacted Section 504 of the Rehabilitation Act of 1973, which forbids any program receiving federal aid from discriminating against an individual by reason of a handicap. See 28 C.F.R. § 41.51(d) ("[r]ecipients [of federal financial assistance] shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons"). Our findings and conclusions in this letter also implicate the State's compliance with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq.

participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(8).[10]

Title II of the ADA prohibits discrimination on the basis of disability by public entities. A "public entity" includes any State or local government, as well as any department, agency, or other instrumentality of a State or local government.  Title II applies to all services, programs, and activities provided or made available by public entities, including through contractual, licensing, or other arrangements.  42 U.S.C. § 12131(1); 28 C.F.R. § 35.102(a); 28 C.F.R. § 35.130(b).  Thus, the State of Mississippi and its agencies are covered by the ADA and are prohibited from discriminating in the delivery of mental health and DD services.

In Title II, Congress established a straightforward prohibition on discrimination: "no qualified individual with a disability[11] shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The ADA's implementing regulations mandate that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).  The "most integrated setting appropriate to the needs of qualified individuals with disabilities" means "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. pt. 35 app. A. at 572 (July 1, 2010).

In construing the anti-discrimination provision contained within the ADA, the Supreme Court held that "[u]njustified isolation ... is properly regarded as discrimination based on disability." Olmstead, 527 U.S. at 597.  The Court recognized that unjustified institutional isolation of persons with disabilities is a form of discrimination because the institutional

---

[10] Congress also stressed that such discrimination and prejudice costs the United States "billions of dollars in unnecessary expenses resulting from dependency and non-productivity." 42 U.S.C. § 12101(a)(9).  This is notable, especially today, given the fiscal and budgetary pressures confronting many states, including Mississippi.

[11] People with mental illness or developmental disabilities are protected by the ADA. "Disability" is defined broadly, with respect to an individual, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 28 C.F.R. § 35.104.  "Mental impairment" includes any mental or psychological disorder such as emotional or mental illness, mental retardation, and specific learning disabilities; and the phrase "major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. Id.  Persons served in the State's mental health system are "qualified" individuals with a disabilities because "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, [they meet] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

placement of persons who can handle and benefit from community settings "perpetuates unwarranted assumptions that persons so isolated are incapable or untrustworthy of participating in community life" and because "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." Id. at 600-01.

The Court described the dissimilar treatment persons with disabilities must endure just to obtain needed services: "In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice." Id. at 601.[12]

A violation of the ADA's integration mandate is established if the institutionalized individual is "qualified" for community placement – that is, he or she can "handle or benefit from community settings," and the affected individual does not oppose community placement. Id. at 601-03. Indeed, the Court stressed that states "are required" to provide community-based treatment for qualified persons who do not oppose placement in a more integrated setting unless the State can establish an affirmative defense. Id. at 607.

Contrary to the requirements of the ADA and its implementing regulations, none of the State's large public or private institutions enable individuals with disabilities to "interact with non-disabled persons to the fullest extent possible." Instead, individuals housed at these facilities live isolated lives, largely cut off from the rest of society. Cf. Disability Advocates, Inc. v. Paterson, 653 F. Supp. 2d 184, 224 (E.D.N.Y. 2009) (finding that "many people with mental illness living together in one setting with few or no nondisabled persons contributes to the segregation of [a]dult [h]ome residents from their community.) Most spend their entire day, every day, in an institutional setting. Individuals housed at an institution are offered very limited opportunities day-to-day for community integration or meaningful employment, and, as a result, have few opportunities to interact with their non-disabled peers in community settings outside the institution. Moreover, the State's institutions limit individual autonomy and provide limitations on people's choices, even while onsite. See also Benjamin v. Dep't of Pub. Welfare, 768 F. Supp. 2d 747, 750 (M.D. Pa. 2011) (noting that individuals in facilities were segregated when they lived in units ranging from 16-20 people, primarily received services on the grounds of the facilities, and had limited opportunities to interact with non-disabled peers). By contrast, community-based programs are integrated services both because they are physically located in

---

[12] Olmstead, therefore, makes clear that the aim of the integration mandate is to eliminate unnecessary institutionalization and to enable persons with disabilities to participate in all aspects of community life. This is consistent with guidance from the President. See, e.g., Press Release, The White House, "President Obama Commemorates Anniversary of Olmstead and Announces New Initiatives to Assist Americans with Disabilities" (June 22, 2009) (in announcing the Year of Community Living Initiative, President Obama affirmed "one of the most fundamental rights of Americans with disabilities: Having the choice to live independently.").

the mainstream of society and because they provide opportunities for people with disabilities to
interact with non-disabled persons in all facets of life.

B. <u>Mississippi Violates the ADA by Over-Relying on Institutions</u>

Mississippi relies more heavily on large institutional settings for people with disabilities
than any other state.  Mississippi is consistently ranked as one of the worst, and often the worst,
on measures of whether persons with disabilities are being served in integrated settings.  Both its
own data and national data show that the State spends less proportionally on community services
and more on institutional placements than any other state.  In fact, Medicaid is currently offering
incentives to states that rely too heavily on institutional services to rebalance their systems of
care through its Balancing Incentives Payments Program.  Mississippi is the *only* state that is
eligible for a 5 percent federal contribution enhancement due to the severity of its imbalance.
Mississippi's over-reliance on institutions is longstanding, in spite of sweeping and powerful
trends over the past half-century that have prompted other states to move away from serving
people with disabilities in large, outdated, segregated institutions and toward more
individualized, independent, effective care in integrated community settings.  Mississippi's
heavy emphasis on providing services to persons with disabilities in restrictive institutional
settings indicates that the State is failing to provide needed services in the most integrated setting
as required by the ADA.

1. *Mississippi Studies*

In recent years, Mississippians have recognized, and reported on, the State's over-
reliance on institutional care to serve persons with disabilities.  The most comprehensive report
was issued in 2008 from the Mississippi Legislature's Joint Committee on Performance
Evaluation and Expenditure Review ("PEER").[13]  J. Legis. Comm. on PEER, Rep. to the Miss.
Leg. No. 511, Planning for the Delivery of Mental Health Services in Mississippi:  A Policy
Analysis (June 26, 2008).  The Mississippi PEER committee concluded that the Board of Mental
Health had not focused on developing adequate community-based programs and reallocating
resources to meet the emergent needs of persons with mental illness in Mississippi.  The PEER
report continues to have relevance today.

The PEER committee concluded that Mississippi was out-of-step with national trends and
was failing to meet the needs of persons with disabilities in integrated community settings:
"Although the mental health environment in the United States has dramatically changed from an
institution-based system to a community-based system in recent years, Mississippi's mental
health system has not reflected the shift in service delivery methods."[14]

---

[13] In response to citizen complaints alleging the inefficient use of resources by DMH, the PEER
committee performed an analysis of how Mississippi delivers mental health services to persons
with mental illness and/or developmental disabilities in the state.  The PEER report was sent to
you, the Lieutenant Governor, and leadership within the State Legislature in June 2008.

[14] The Mississippi PEER committee recognized that service delivery throughout the United
States had shifted from an institutional model to a predominantly community model: "the

The committee recognized that due to the ADA and the Olmstead opinion, "the state will be forced to move toward providing more community-based care in the near future." The committee concluded that the State was not in a good position to address outstanding issues because the Mississippi Board of Mental Health "has not aggressively sought plans for reallocation of resources to meet emerging needs in addition to efforts to seek additional funding to meet those needs ... [thus,] allowing the development of community-oriented programs to fall behind."

Just last year, the Mississippi Psychiatric Association ("MPA") submitted a report to various legislative subcommittees, concluding that the State's current model of delivering mental health care was a "broken non-system," and that DMH was pursuing a course of action that was counter to the concept of community-based care. MPA faulted the Board of Mental Health for failing to develop and implement effective services for those with serious mental illness, thus, causing them to receive "inadequate, community-based treatment, resulting in their consuming more expensive resources because of repeated admissions to local emergency departments, local hospitals, and state institutions." When adequate community services are not available, MPA concluded that persons in crisis are "at risk for further decompensation, followed by hospitalization or confinement in jail." MPA called on the DMH Board to make addressing the needs of individuals with serious mental illness a top priority, to rely less on inpatient services, and to focus more on the development of adequate community programs, especially adequate and appropriate housing. MPA concluded that the State has pursued brick and mortar projects while the national trend has been toward reallocation of resources to community-based programs.

*2. National Studies*

National reports also demonstrate that Mississippi relies more heavily on institutional care than do other states. In its 2011 annual report, "The Case for Inclusion," United Cerebral Palsy ("UCP") ranked Mississippi last in terms of supporting individuals with DD in smaller community settings of three people or less. UCP concluded that Mississippi served less than half of the persons with DD in its system in such small community settings, even though the national average was 80 percent; Nevada, Vermont, and Arizona served more than 95 percent of persons with DD in their systems in community settings of three persons or less.

UCP also ranked Mississippi 51st among all 50 states and the District of Columbia in terms of allocating resources to persons with developmental disabilities in the community. UCP concluded that Mississippi devoted only one-third of its total DD expenditures to non-ICF community settings; by contrast, a total of 31 jurisdictions devoted 80 percent or more of their

---

dominant thrust in national mental health policy in the twentieth century moved away from housing clients in large state institutions and toward treating individuals in a community setting ... [since the 1960's] public mental health policy nationwide has trended toward diminishing the role of public mental hospitals and toward an increased reliance on outpatient community services."

total DD expenditures to the community and a few states spent 99 percent or more on funding integrated community settings.[15]  The national average allocation of resources to people in non-ICF settings was 77 percent of expenditures.

In fact, UCP has ranked Mississippi last in its overall list since UCP began ranking the states in 2007.  UCP reported that Mississippi is the only jurisdiction in the country that serves more than 25 percent of the persons with DD in its system in large state institutions, while the national average is just 3.3 percent, and 41 jurisdictions serve 5 percent or fewer in large state institutions.  Nine states and the District of Columbia have no state institution for persons with DD; 13 other states only have one large state facility remaining.

The National Alliance on Mental Illness ("NAMI") found that Mississippi has a higher per capita rate of state psychiatric beds than any other state in its "Grading the States 2009: A Report on America's Health Care System for Adults with Serious Mental Illness."  This over-reliance on hospital beds is also reflected in State spending.  In its 2011 report, "State Mental Health Cuts: A National Crisis," NAMI reported that in 2006, Mississippi spent only 46 percent of state mental health agency funding on community mental health services; the national average is about 70 percent.  Moreover, NAMI reported that from 2009 to 2011, Mississippi cut its state mental health budget by over $38 million -- as a percentage of its overall state mental health budget, this is more than all but seven states.  By contrast, NAMI reported that 19 states, including the nearby states of Florida, Georgia, Alabama, Kentucky, and Arkansas, increased their state mental health budgets during this time.

### 3.  State Construction of New Institutions

Not only is Mississippi continuing to rely heavily on existing large institutions built decades ago in another era, but the State is still investing in opening *new* institutions to serve persons with disabilities.  This runs directly counter to well-established professional and legal dictates, including those set forth in the ADA, that persons with disabilities fare better in, and are entitled to live in, integrated community settings.

One of the most disheartening aspects of our onsite inspection was touring the newly constructed buildings for persons with DD on the Boswell campus.  The new construction was very institutional -- the building we toured had three wings with about a dozen bedrooms on either side of a long hall on each wing with a common day room at the end of each hall.  Plans called for rooms to possibly be used for time-out or restraint.  We understand the four new institutional buildings were going to serve about 140 persons with developmental disabilities.

The institutional construction in Mississippi would have fit in neatly a half century ago, at the height of states' reliance on institutional care, but it is entirely out of place in 2011.

---

[15] See also David Braddock, Richard Hemp & Mary C. Rizzolo, The State of the States in Developmental Disabilities 2011 (in FY 2009, Mississippi spent 80 percent of the federal funding it received for persons with DD on institutional care in ICF settings, spent over 61 percent of available DD dollars on institutional services, and served 67 percent of all persons in the State's DD system in institutional or congregate settings of seven persons or more).

Moreover, the new institutional buildings at Boswell were expensive – the State informed us that the original cost of the new construction was over $7 million. This is a high price to pay for a service that only brings Mississippi farther away from complying with the ADA. State leadership could have used this money to build needed capacity in the community that, as we discuss below, would have served many more persons with disabilities than the 140 or so to be served on the Boswell campus.

The new institutional construction at Boswell is not an isolated example, but is merely the latest in a steady stream of newly built or renovated institutions operated by DMH in the past decade. Mississippi opened the following residential facilities in recent years: the aforementioned four buildings at Boswell (2011), the Specialized Treatment Facility (2004), the South Mississippi State Hospital (2000), and the North Mississippi State Hospital (1999). In addition, the State has built the Central Mississippi Residential Center (2003), dozens of ten-bed off-campus ICF residences for persons with DD, and is planning and constructing new buildings at East Mississippi State Hospital.[16]

C.   The State is Violating the ADA By Failing to Serve Qualified Individuals with Disabilities in the Most Integrated Setting

Mississippi is violating the ADA by failing to provide alternatives in integrated community settings to qualified individuals currently in institutions. See Olmstead, 527 U.S. at 607.

Persons currently residing in institutions in Mississippi are "qualified" for community placement. Indeed, during our visits, various officials acknowledged that persons institutionalized in Mississippi could transition to and live in the community with adequate and appropriate services and supports. Right now, scores of qualified individuals with disabilities live in Mississippi institutions who can handle and would benefit from community placement pursuant to Olmstead. Mississippi continues to institutionalize individuals whom other states have long served in the community. For example, over 35 percent of the people whose individual support plans we reviewed were diagnosed with mild or moderate intellectual disabilities. The Mississippi PEER report found that more than 500 individuals with mild or moderate mental retardation were confined in DMH institutions in 2007, and that, "[a]n evaluation of clients' individual needs could result in appropriate transitioning of some clients from institution-based service delivery to community-based service delivery."

With support these individuals could return home or avoid institutionalization. For example, one child with autism lived in one of the State's institutions for five years. Once he was provided with Medicaid community-based waiver services, including behavioral support and

---

[16] In responding to the PEER report in 2008, the Board of Mental Health clarified that many of the newly built or renovated institutional facilities, including the mental health facilities, the Specialized Treatment Facility, as well as the ten-bed ICFs, were initiated not by DMH, but by the legislature. The Board noted that DMH Executive Director LeGrand, had frequently stated in public that future expansion by DMH will not be "brick and mortar."

attendant care, he was successfully able to move back home with his family. Another young woman with Rett syndrome was able to remain at home and avoid entering an institution because she receives total care at home through the waiver, including attendant care, nursing care, medical supplies, a wheelchair, and short-term respite care. Many others could return home or avoid institutionalization altogether if they received sufficient care and support in the community.

When individuals in institutions do not oppose, and especially when they affirmatively request community placement, it is the State's responsibility to develop and implement prompt and effective steps to transition and then place and serve them in integrated community settings. Yet during the course of our investigation, we commonly found examples of people who had affirmatively expressed an interest in leaving their institutional setting, wanting to live instead in the community. For example, one man with a diagnosis of a mild intellectual disability states in his plan that his vision for the future is to live in his own home and work at Walmart. Another man with a mental illness approached our team during a visit to a State hospital and immediately said, "I'm really wanting to get out." Vision statements and objectives in many plans articulate the individuals' goals of integrated settings. Too often, we found, their requests were not granted in a timely manner, or at all.

### 1. Institutional Thresholds to Placement

Treatment teams and those responsible for assisting families in accessing services in Mississippi often require individuals with disabilities to meet goals unrelated to success in the community before recommending transition to the community. Individuals, families, and teams should all be involved in a robust discussion of needed supports and placement options before even entering an institution. Once admitted, families and teams should work toward placement in the most integrated setting appropriate and consider what services would enable individuals to succeed in the community. See Messier v. Southbury Training Sch., 562 F.Supp.2d 294, 322-323 (D. Conn. 2008).

Instead of quickly identifying necessary supports and developing treatment plans to offer that support in the community, the State has a pattern of serving individuals in institutional settings for years on end. During the course of our investigation, we learned that 20 people have been residing in State DD institutions for over 50 years, and approximately 70 percent of all regional center residents have lived at the regional center for more than a decade. Over two dozen people in the State psychiatric hospitals had been institutionalized for more than 20 years, including one woman who has been at Mississippi State Hospital since August 1967 – over 44 years. These long stays indicate that treatment teams are not working to transition people to appropriate community placements.

We discovered that some teams at the State's DD institutions recommend community placement only after the individual acquires a certain skill or passes a certain threshold at the institution. For example, one young woman whose plan states that her family wants to consider community services remains in the facility and her individual support plan does not include a plan for arranging community supports, instead identifying goals such as stating her name and completing a puzzle. Similarly a young man whose goal is to live in a group home closer to his

family stated that he was interested in touring a range of placements, but his plan makes no reference to arranging tours, instead proposing objectives such as flossing teeth and writing personal information. It is improper to deny an individual with DD access to an integrated community setting on this basis. Persons with DD need not jump through any artificial hoops at an institution merely to obtain their independence. Moreover, it is generally accepted that individuals with DD learn best in real world settings and that they often have difficulty generalizing skills obtained in stilted institutional environments.

Similarly, facility treatment plans for persons with mental illness similarly list barriers to discharge that relate to "compliance," rather than to stabilization. This focus on obedience and hospital rules is disconnected from the skills the individual needs in order to live safely and successfully in the community. For example, one plan states that "the patient will be able to be discharged once his noncompliance with building rules has decreased." Other plans require that individuals remain in the facility and demonstrate compliance with a plan for weeks or months after they stabilize. One person was required to "state to treatment team weekly one benefit of his medications as it related to his illness; his responses will be noted per treatment team notes for 5-6 weeks," and another plan required that "the patient will exhibit effective management of psychotic and medical symptoms for 90 consecutive days."[17]

We also found that some teams insist on evidence of markedly reduced behaviors before community placement will be considered for certain individuals. This is troubling, as the very nature of the institution itself – the lack of privacy, the noise, the forced interaction with others, the regimented scheduling – may actually cause or aggravate the person's behaviors. As such, the institutionalized person's behaviors may never abate and he or she will be confined to an institutional setting indefinitely, simply because of the deleterious nature of the institutional setting itself. This vicious circle captures the person in the least integrated setting and sets up a situation in which it will be very difficult for the person to get out. Staff at a DD facility told our team that even when one young man reaches the institutional goals in his plan, he will be retained in the facility for an unspecified period to ensure that his behavior does not deteriorate. For these and many other reasons, it is improper for teams to conclude that community placement is inappropriate until an individual with DD meets certain thresholds while still in the institution.

### 2. Facility Director Guardianship

In the Mississippi DD facilities, State facility directors serve as guardians or "surrogates" for a significant number of individual residents with DD. Specifically, the State directors are guardians for over 160 individuals (about eight percent of the total institutional DD census system-wide) across the six State facilities. Therefore, the State directors do not face any external opposition to community placement.

---

[17] This emphasis on compliance is particularly problematic given that individuals in Mississippi's psychiatric facilities are almost exclusively admitted through involuntary commitment proceedings and hospital compliance rules may compel them to remain longer than necessary – even beyond legal commitment parameters.

In spite of this, we learned that the State directors had rarely, if ever, attended annual or other individual team meetings for their assigned surrogates. This is important because these team meetings can serve as a catalyst for community placement decisionmaking and action. Without the participation of the State director guardian, teams have made placement decisions inconsistent with the current integration emphasis of State leadership on the Board of Mental Health and in DMH. Even in cases where an individual and/or team members identified a goal of community placement, the surrogates did not attend and advocate for realizing that goal. In fact, staff at one facility erroneously disqualify people who have facility director surrogates from waiver services. Plans of individuals with facility director surrogates articulated this policy, stating, for example, "Due to the director of the Ellisville State School serving as the client's surrogate he is not eligible to participate in the HCBW program at this time." The failure of the facility directors to participate in the team process represents a lost opportunity to take tangible steps to help meet the needs of institutionalized persons in more integrated settings as required by the ADA.

DMH has recently created a number of Transition Coordinator positions to work with teams and administrators at the State DD facilities to help facilitate placement of individuals from institutions into the community. The work of the Transition Coordinators may prompt teams to develop written discharge plans for institutionalized individuals – plans that do not now currently exist for all but a handful of persons who are about to leave for another setting.

D.   The State is Violating the ADA by Placing People at Risk of Unnecessary Institutionalization

In addition to those currently harmed by unnecessary institutionalization, many other individuals in the State are at risk of needless segregation in violation of the ADA. Courts have determined that the ADA's integration mandate not only applies to individuals who are currently institutionalized, but also to individuals who are at risk of unnecessary institutionalization because of a jurisdiction's administration of its health care delivery system. See M.R. v. Dreyfus, 2011 WL 6288173 (9th Cir. 2011) (finding risk of institutionalization when state reduced hours of in-home personal care); Radaszewski v. Maram, 383 F.3d 599 (7th Cir. 2004) (ADA applied to individual at risk of entering a nursing home); Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175 (10th Cir. 2003) (same); Pitts v. Greenstein, 2011 WL 2193398 *2 (M.D. La. 2011) ("The ADA's and Section 504's 'integration mandate' prohibits a state from increasing an individual's risk of institutionalization if reasonable accommodations are available"); Brantley v. Maxwell-Jolly, 656 F. Supp. 2d 1161, 1170 (N.D. Cal. 2009) (stating that the risk of institutionalization is sufficient for a violation of the ADA); M.A.C. v. Betit, 284 F. Supp. 2d 1289 (D. Utah 2003) (same). The State violates the ADA when individuals face serious risk that they will be forced to enter an institutional placement, public or private, because they cannot get the support that they need in the community.

Due to insufficient community supports in Mississippi, many people with DD awaiting services, or in need of more comprehensive services, are at risk of unnecessary institutionalization. Pitts v. Greenstein, 2011 WL 2193398 *2 (M.D. La. 2011). Over 1,900 individuals with DD are on the waitlist for waiver services, yet only *two* individuals have gotten off the waitlist since the start of FY 2010. The State offers waiver slots to individuals on the

waitlist on the basis of application date alone and fails to regularly assess individuals' risk of institutional placement. If an individual or their family experiences a crisis, they may have no alternative other than institutional care. Moreover, as people on the waitlist get older and as their families age, they are at greater risk of institutionalization, unless they receive community-based support. A number of files we reviewed demonstrated that individuals currently in State facilities entered when family members had health crises and could no longer offer needed support on their own. One young woman lived at home for many years but entered an institution when her mother became ill. She continues to attend public school and could return to the community if her family had support. Families across the State have expressed a need for support, without which their loved ones will no longer be able to succeed at home.

When we met with family members and advocates of persons with DD who live in the community, they expressed frustration at the State's confusing procedures to access school supports and related services, IDD waiver, supported living, and meaningful day programs. Several parents told us they do not want to place their children in institutions, but do require supports such as crisis intervention, respite care, and supervised living, to meet the needs of their loved ones. Because of the slow-moving waitlists for services and lack of necessary supports for these families, their loved ones are placed at significant risk of future institutionalization -- in many cases the only option for them to receive the services they need.

Individuals with mental illness also face a serious risk of unnecessary institutionalization and re-institutionalization. Many individuals in Mississippi cycle in and out of hospitals, local and state-run, because they do not receive the intensive supports that they need when discharged. Individuals have no alternative but to receive care in a hospital setting away from family, friends, and other natural supports, then return to their communities where they often get little treatment, destabilize, and return to the hospital. In FY 2010, we found that 437 adults were admitted at least twice to a Mississippi mental health hospital, that 86 persons were admitted three or more times, and that at least two people were admitted six or more times. State records revealed that one man had been admitted to a State psychiatric hospital 29 times in recent years. Many more likely cycled through local hospitals' psychiatric units, CICs, or local jails.

Readmissions typically result from insufficient support in the community and inadequate coordination between treating professionals in facilities and those who support the individuals when they are in the community. In recent years, dozens of people with mental illness were discharged from one of the four State psychiatric hospitals to settings with few, inadequate, or no support services to meet their needs in the community, including personal care homes, halfway houses, shelters, or even the streets. Such settings do not provide the array of services that someone with a serious mental illness needs when transitioning back to the community, such as crisis supports, case management, transportation to medical appointments and community activities, and medication management. In particular, we understand that State hospitals regularly discharge people to personal care homes that often fail to meet the needs of the individuals who live there.[18] Not surprisingly, many of these individuals were unnecessarily

---

[18] In addition, we have learned that many of these homes fail to provide individuals with adequate food, clothing, medicine, access to health care, and reasonably safe conditions, including a physical environment free of environmental hazards. We also understand that in

forced to return to the State psychiatric hospital for treatment, sometimes more than once in any given year.

At the time of placement, the State often fails to coordinate between the institutions and the community providers to ensure that there is in place an adequate array of services and supports in the community to meet the individual's needs, creating a risk of reinstitutionalization. Community mental health centers are core providers supporting people with mental illness when they return to the community, yet they are not involved in treatment and discharge planning. Typically, the facility merely schedules an appointment for a person who is returning home at his local CMHC. In addition, there is very little communication between the hospital and the local provider in advance of a discharge. At best, the State attempts to ensure that an individual with mental illness has enough medication to make it to the next appointment with the psychiatrist. But this is only one critical component of the support that will enable success. In addition, as we discuss below, the individual may need other intensive community supports such as Assertive Community Treatment ("ACT"), case management, supported employment or assistance identifying other activities to remain engaged in the community, and supported housing or other housing assistance.

E.   The State Must Realign and Expand Services to Support People in the Community

1.   *The State Has Failed to Implement Its Olmstead Plan*

In response to the Supreme Court's Olmstead decision, Mississippi was one of the first states in the country to develop an "Olmstead Plan." One way a state can meet its obligations under Olmstead is to develop and implement a comprehensive and effective plan to move individuals with disabilities into the community, with any list of individuals waiting for services moving at a reasonable pace. See Olmstead, 527 U.S. at 584; see also Frederick L. v. Dept. of Public Welfare, 422 F.3d 151 (3rd Cir. 2005) ("[A] comprehensive working plan is a necessary component of a successful 'fundamental alteration' defense."); Pa. Prot. and Advocacy, Inc. v. Dept. of Public Welfare, 402 F.3d 374, 381 (3rd Cir. 2005) ("[T]he only sensible reading of the integration mandate consistent with the Court's *Olmstead* opinion allows for a fundamental alteration defense only if the accused agency has developed and implemented a plan to come into compliance with the ADA.").

On March 23, 2001, the Mississippi legislature mandated the development of a comprehensive plan to provide services to people with disabilities in the most integrated setting appropriate to their individual needs. In issuing this directive, the legislature established a goal of no later than June 30, 2011, for the State to have community services available for all people with disabilities who met Olmstead criteria. For such individuals, the legislature stressed that they should receive the supports necessary to live as independently as possible, that supports should encourage the integration of people with disabilities into the community to the fullest extent possible, that supports should be flexible enough to accommodate the unique needs of the

---

some of these homes, staff abuse or neglect the individuals, misappropriate individuals' funds or property, and deny personal rights.   See, e.g., Ignored and Neglected:  Personal Care Home Crisis in Mississippi, Disability Rights Miss., Jan. 14, 2010.

individuals as they change over time, and that supports should be developed and expanded in the state that are necessary, desirable, and appropriate to support individuals and their families.

In conjunction with various private stakeholders, the State then developed and submitted the mandated Olmstead Plan, entitled "Mississippi Access to Care ("MAC")," to the Mississippi legislature on September 30, 2001. The overall stated purpose of the plan was to "create an individualized service and support system that enables individuals with disabilities to live and work in the most integrated setting of their choice. It is our vision that all Mississippians with disabilities will have the services and supports necessary to live in the most appropriate and integrated setting possible."

The State's plan set forth a schedule for annual transition of individuals from institutions to the community, with a total of 1,035 persons to be transitioned by 2011. To accomplish this, the State's plan called for increasing the capacity of community-based services and supports, especially increasing the availability of "safe, affordable, accessible housing options" in the community, more flexible community services and supports, community transportation, and specific system modifications, so as to transition individuals from institutions, thereby "facilitating the earliest possible re-entry into the community." Specifically, the MAC plan identified the need to provide subsidized housing assistance to several hundred persons with disabilities and to expand the number of supervised apartments for persons with DD. The MAC also cited the need for other community services and supports, including day support, case management, mobile teams, and intensive in-home/residential treatment.

The State's Olmstead Plan also relied heavily on the prospective State use of services and supports funded through the Medicaid IDD waiver to bring the State into compliance with the integration mandates of Olmstead. To increase the State's ability to provide flexible community services to meet the individualized needs of persons with disabilities and to comply with the integration mandates set forth in Olmstead, the MAC plan identified the need to expand the number of individuals served by the State's existing waivers and to expand the menu of services allowed under these waivers. The State's MAC concluded: "Mississippi has a system of home and community-based waivers that currently serve individuals in community-based settings. However, there is a need for changes in the delivery of those services as well as expansion of the waivers." The State's Olmstead Plan called for expansion of the Elderly/Disabled waiver to include an additional 3,750 persons by 2007; the Independent Living waiver to include an additional 2,500 persons by 2007; the IDD waiver to include an additional 1,600 persons by 2011; the Assisted Living waiver to include an additional 500 persons by 2007; and the Traumatic Brain/Spinal Cord Injury waiver to include an additional 2,000 persons by 2007. The State did not meet any of these targets.

The Olmstead Plan called for expansions of services which the State has not implemented. For example, the MAC Plan calls for the State's IDD waiver to now serve 3,300 persons with DD; instead, at the end of FY 2011, Mississippi served only 1,817 persons – almost 50 percent less than what the State identified as necessary to achieve integration mandates. The MAC also called for an expansion of community-based services to adults and children with mental health and emotional needs. It called for the State to apply for funding to serve 1,500

children with serious emotional disturbances.[19]   It also planned for the expansion of services and service providers for therapeutic foster care to include an additional 900 children with serious emotional disturbances by 2011, and to increase the number of children and youth served in therapeutic group homes by 260 by 2006.

    We understand that the State has never fully implemented its Olmstead Plan.  Apparently, the legislature has failed to provide the necessary funding.  In 2003, the first and last MAC implementation report acknowledged that "budget shortfalls prevented the State from funding full plan implementation."  The Mississippi PEER committee also concluded in its 2008 report that the State's Olmstead Plan has not been implemented because it had never been funded.  The Board of Mental Health also recently confirmed that "resources have not been made available to fund the MAC plan."

    Mississippi's acknowledged failure to implement its own State Olmstead Plan for a decade is perhaps the most straightforward indication of the State's failure to comply with the important integration mandates of the ADA.

### 2.  Expansion of Existing Services is a Reasonable Modification

    As envisioned by the MAC Plan, the State must expand its existing services to support individuals with mental illness and developmental disabilities in the community.  Expanding these programs to serve others who are unnecessarily institutionalized or at risk of unnecessary institutionalization is a reasonable modification to the State's system.  Disability Advocates, Inc. v. Paterson, 598 F.Supp.2d 289, 335 (E.D.N.Y. 2009) ("Where individuals with disabilities seek to receive services in a more integrated setting-and the state *already provides* services to others with disabilities in that setting-assessing and moving the particular plaintiffs to that setting, in and of itself, is not a 'fundamental alteration.'").

    In fact, the State's leadership has repeatedly acknowledged that it can and should rebalance services to emphasize community support.  In responding to the PEER committee report in 2008, the Chair agreed that the Board of Mental Health would develop and implement changes to "refocus the Department's service/support delivery system from one that is predominantly institution-based to one that will rely more heavily on a community model … and to reinforce our determination to create a strong, expanded community-based system."  The Board asserted that it was "pleased that most of the recommendations in [the PEER] report are directly in concert with the vision of the Board of Mental Health and our Executive Director of a future moving away from additional institutional care to expanded community services."  The Board stated that it is "committed to improving and changing the direction of mental health services for Mississippi's citizens."

---

[19] In the years since the publication of MAC, the State created a new program, MYPAC, which is a demonstration grant and waiver program for children with serious emotional disturbance, providing assessment services, case management, wraparound services, and respite.  The state served 586 youth in FY 2011 – barely a third of the children and youth Mississippi proposed to serve in the MAC.

This stated commitment to community-based services continues. For example, on August 19, 2011, in the face of prospective cuts to community programs, DMH Executive Director LeGrand informed the State Division of Medicaid that DMH is committed to developing community-based service options that are "desperately needed for thousands of individuals and families that rely on the public mental health system as their only viable option for mental health treatment in Mississippi … eliminating or reducing many of the services that allow individuals to be served in the community, rather than a more restrictive environment, is in conflict with support of a community-based mental health system." He reiterated that "the goal of DMH is to continually strive to develop new ways to adequately serve the citizens of Mississippi in the most integrated settings available."

The current DMH Strategic Plan also recognizes the need to transform the current institution-heavy system to a community-based system:

- A primary goal is to work to transform the current State system to "a person-driven, community-based service system."

- The stated purpose of the plan is to "drive the transformation of the system into one that is outcome and community-based."

- The "core values" and "guiding principles" of the plan emphasize community services: "We believe that community-based service and support options should be available and easily accessible in the communities where people live."

- DMH stresses that it is "committed to preventing or reducing the unnecessary use of inpatient or institutional services when individuals' needs can be met with less intensive or least restrictive levels of care as close to their homes and communities as possible."

- A "core competency" is to "shift in focus to a community-based service system."

- The plan calls for the development of a "seamless community-based service delivery system" that emphasizes the development of "new and expanded services in the priority areas of crisis services, housing, supported employment, long term community supports and other specialized services."[20]

The State's failure to develop its promised services is a barrier to discharge and places people at risk of institutionalization. We uncovered many examples where teams at institutions did not recommend integrated placement for a person simply because appropriate residential or other programs did not exist in the community. Many families who need community support for an individual with DD expressed interest in the IDD waiver, but the State's facility staff did not

---

[20] Consistent with this, in its FY 2011 State Plan, DMH's Bureau of Intellectual and Developmental Disabilities stressed: "Central to the comprehensive public mental health service system is the belief that individuals are most effectively treated in their community and close to their homes, personal resources, and natural support systems."

offer them the intensity and flexibility of services that the waiver program is intended to provide. State documents instead appear to discourage families from pursuing waiver services by describing them as limited. For example, the waiver information sheet that staff present to families at Hudspeth describes key services that the waiver is required to provide, including supported living, as "rarely available." Given this, it is likely that some people enter or remain in institutional care simply because other alternatives are not available.

In meetings with individuals receiving services and their family members, we learned that the absence of residential, educational, employment, transportation, and therapeutic services in their home communities led them to seek institutional placements for their family members as a last resort. We learned that school-based services, described as "glorified babysitting," failed to offer the appropriate array of special educational services required for children with disabilities. Options were particularly lacking for those individuals who need 24-hour supervision and for those in rural settings. Families did not seem aware of the supervised apartment settings that the State currently offers in small numbers, staffed 24 hours per day and with oversight through the regional centers, or had not been offered that option. One woman told us that she would love to see her brother in an apartment someday, but he requires supervision that she believed would be unavailable in an apartment setting. Even parents who need support only during the workday so that they can continue to support their families cannot find staff trained to offer that support, or get sufficient funding. We understand the difficult struggle that these families faced when deciding how to best support family members when community services are lacking. The ADA requires the State to offer families real, safe community alternatives.

### 3. Expansion of Services Can be Facilitated by Reallocation of Resources and Is Not a Fundamental Alteration

On average, the cost of care in the community would be less than care in institutional settings. Of course, the cost of care is not, in and of itself, dispositive when determining whether changes in services are a reasonable modification required by the ADA. See Fisher, 335 F.3d at 1183. ("If every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed."); Frederick L. v. Dep't of Pub. Welfare of Pa., 364 F.3d 487, 495 (3rd Cir.2004). A state is required to provide services in the most integrated setting appropriate unless it can demonstrate that doing so constitutes a fundamental alteration of its program. Olmstead, 527 U.S. at 605. It is clear that Mississippi could serve more individuals in more effective therapeutic settings if the State shifts resources to the community. Nonetheless, the State has taken insufficient steps to reallocate existing resources to better meet the needs of persons with disabilities in integrated community settings.

The cost of providing institutional care to persons with disabilities is nearly always more expensive than providing care in integrated community settings. The Mississippi PEER committee reached the same conclusion, reporting in 2008 that, generally, institution-based services cost more per client than community-based services and that the State's focus on institution-based care "represents a much more expensive service delivery model than does community-based care." The committee found that "[b]ecause of limited resources, [DMH] should reprioritize needs based on the best possible return on client care to utilize each dollar of

funding most effectively ... limited funding should serve as a strong indicator to continually tweak the system and to plan to maximize each available dollar." In fact, it appears that a reallocation of Mississippi's existing financial resources could have enabled more timely and complete implementation of the State's Olmstead Plan (and/or the development and implementation of alternative community options).

The Mississippi PEER committee recommended that, if community-based programs were expanded, residents of institutions could then transition to community programs and resources could be freed for the development of additional community resources. The committee concluded that appropriate transitioning of people from institutions to the community "could provide the opportunity for closure of some institutions (or of some units within institutions) and thus free a portion of the department's resources to be used for other mental health needs.".

As in much of the country, the economic climate in Mississippi has been challenging in recent years. We recognize that the State has been facing a recurring multi-billion dollar annual deficit. The State informs us that within approximately the last five years, the Mississippi legislature has cut DMH funding significantly – by millions of dollars – and that for a period, DMH had to assume the additional cost of funding various community programs from its established budget without the infusion of new funding to cover this unanticipated expense.

Other than closure of beds at two State hospitals, the State has largely kept intact its elaborate institutional service-delivery system. Given the need to spend precious resources wisely and efficiently, it is puzzling that the State has not done more to reallocate resources away from very costly institutional settings to much less expensive (and more effective and therapeutic) community settings.

### 4. Critical Services for Expansion

While the critical services that will support individuals with disabilities in the community are available in Mississippi, they are not currently available in sufficient quantity or in all parts of the State.

#### a. IDD Waiver Services for Individuals with DD

The IDD waiver provides a range of community-based supports to individuals with DD to live in the community and avoid institutionalization. The IDD waiver has been an effective alternative to institutionalization for many individuals with DD around the country and in the State. But Mississippi has not taken full advantage of the waiver. The State already has authorization to provide additional waivers. In FY 2011 the Centers for Medicare and Medicaid Services ("CMS") authorized the State to have 2,600 slots in its waiver, but the State funded only 1,817 (down from 2,009 in FY 2008). The MAC called for the State's IDD waiver to now serve 3,300 persons with DD. If Mississippi fully funded this waiver, it could serve hundreds more individuals with DD who are currently unnecessarily institutionalized or being placed at risk of unnecessary institutionalization while they languish on the waiver waitlist.

The current DMH Strategic Plan identifies the need to provide community supports for persons transitioning to the community through participation in the "Money Follows the Person" ("MFP") project. This includes expanding funded waiver services to enable persons with DD to transition to the community, increasing the number served on the IDD waiver, and transferring persons from nursing homes to the community. MFP also enables the State to draw down an enhanced federal Medicaid contribution of over 80 percent.

      b. Mental Health Services

Already, Mississippi makes available critical services to support people with mental illness, though not in sufficient quantity or with equal distribution. The CMHCs are all required to offer crisis services, psychosocial rehabilitation, case management, therapy, psychiatry, inpatient referral, support for family education, support for consumer education, prescreening for commitment, day treatment, functional assessment, and Making a Plan ("MAP") teams. In addition, seven crisis interventions centers served 1,512 people in FY 2010, returning them home after a brief stabilization.

Some community mental health regions also offer mobile crisis services that respond to people wherever they are and have crisis hotlines where they can reach a provider any time of day or night. In January 2011, a Mississippi legislative subcommittee concluded that there was inadequate community capacity to meet the needs of persons with mental illness living in the community, and specifically, that an expansion of crisis services is necessary. Report of the Schweitzer Subcommittee on the CIT/Crisis Services System in Mississippi to the Joint Legislative Study Committee on Improving the Mental Health System in Mississippi and its Advisory Council, Jan. 10, 2011. The DMH Strategic Plan identifies a goal of developing a comprehensive crisis response system with crisis stabilization services to divert people from inpatient settings, reduce lengths of stay there, and reduce recidivism; 24/7 mobile crisis teams in every county; crisis support plans for persons at risk; and crisis and respite services for persons with developmental disabilities.

Beyond general case management, some counties provide intensive case management and two offer ACT teams to serve the highest need individuals in those areas. ACT is an intensive community-based mobile support service to help persons with mental illness succeed in the community and avoid crises and other adverse events, including needless and costly trips to hospital emergency rooms or admissions to psychiatric hospitals, unwanted involvement with law enforcement, and even incarceration. ACT and the equivalent services for children, often called wraparound services, are well-recognized, essential components of any mental health system. Yet the Schweitzer subcommittee also concluded that most regions lacked sufficient (or had no) ACT. In 2010, the MPA emphasized the need for more and better ACT teams, which they credit for alleviating psychiatric symptoms, as well as reducing homelessness and inpatient psychiatric rehabilitation.

Housing resources also vary by region, with some regions offering supported housing, HUD 811 housing,[21] and group homes. The current DMH Strategic Plan sets forth particular objectives to expand community capacity within the next five years. One of the key objectives in the plan is to "increase statewide availability of safe, affordable, and flexible housing options, and other community supports." This includes creating linkages with multiple housing partners, identifying services and funding to sustain permanent supported housing, and providing bridge funding for supported housing.

Children's services differ depending on the region, but typically also include Making a Plan multi-system teams serving children at risk of institutionalization, therapy, school-based outpatient services, and day treatment. The MYPAC program offers alternate services to traditional PRTFs for youth still needing the same level of care. Among the MYPAC services are assessment services, case management, wraparound services, and respite. In addition, some regions provide transitional outreach services, offering support services needed by youth 16 to 21 years of age.

In August 2011, the Mississippi Division of Medicaid ("DOM") proposed a number of changes to its Medicaid plan, and it filed proposed regulations to accompany a Medicaid State Plan Amendment in November. The State has not yet submitted the Plan Amendment itself. Among the services that the DOM proposed were a number of supports aimed to help people with significant mental health needs remain in the community. The regulations incorporate crisis services, flexible team supports for adults through ACT, peer support, wraparound facilitation, intensive outpatient psychiatric services, treatment foster care, and community respite. These services already exist in parts of the State, but not every CMHC offers each service, in large part because Medicaid does not cover them in the State's current plan. As the State has decided to incorporate them into the State Plan, expanding these critical services will require only a reasonable modification of the service system.

F.  The State Fails to Provide Children with Disabilities with Medically Necessary and Educational Services, in Violation of Federal Law, Which Further Exposes Children to Unnecessary Institutionalization

Hundreds of those who are unnecessarily institutionalized in Mississippi in violation of the ADA are children with disabilities.[22] The harm that these children experience when they are removed from their homes and placed in segregated settings is sometimes the result of failure to

---

[21] The U.S. Department of Housing and Urban Development ("HUD") funds a program intended to create affordable housing for people with disabilities called Section 811 housing. The program provides funding to nonprofit organizations to develop rental housing with the availability of supportive services for very low-income adults with disabilities, and provides rent subsidies for the projects to help make them affordable.

[22] Children with disabilities in Mississippi are institutionalized in large facilities, though the State recognizes the effectiveness of supporting children in their homes, as required by the ADA. The State currently serves 169 children 21 years and under in institutions for people with developmental disabilities and 123 children in psychiatric facilities.

provide services under EPSDT or the IDEA.  Under the Medicaid Act, Mississippi is required to provide children with disabilities with certain minimum mandatory services, including EPSDT services.  See 42 U.S.C. § 1396 et seq.  EPSDT services provide eligible children with a range of supports and services that can be critical to serving children successfully in their homes and communities.[23]  Additionally, under the IDEA, the State is required to identify, locate, and evaluate all children with disabilities, so that qualifying children can receive supports and services in their local schools that, likewise, can play a critical role in serving children in the community.  20 U.S.C. § 1412(a)(3) ("child find").  Our investigation pursuant to CRIPA found that, in addition to violating the ADA, Mississippi fails to comply with the Medicaid Act's EPSDT mandate and the IDEA's "child find" requirement and, as a result, children with disabilities in Mississippi are further exposed to needless and harmful institutionalization.

Children are particularly vulnerable to the deleterious effects of unnecessary institutionalization.  They learn through modeling and imitation and, as a result, need positive role models who mentor, teach skills, and encourage appropriate social interaction with others.  Children in institutional settings are deprived of these normalizing experiences and, instead, are surrounded by other children with disabilities, and isolated from family, friends, and children without disabilities.  Mississippi's failure to provide EPSDT services, and to identify, locate, and evaluate children for eligibility to receive IDEA services is a substantial cause of the inappropriate institutionalization of children in Mississippi.

### 1. The State Fails to Provide Medically Necessary Services to Children with Disabilities in Violation of the Medicaid Act's EPSDT Mandate.

State participation in Medicaid is voluntary, but once a state elects to participate, it is required to provide certain minimum mandatory services, including EPSDT services.  See 42 U.S.C. § 1396 et seq.; Frew v. Hawkins, 540 U.S. 431, 433 (2004).  Under the EPSDT provisions of the Medicaid Act, participating states must provide coverage to Medicaid-eligible individuals under the age of 21 for all medically necessary treatment services described in the Medicaid Act at 42 U.S.C. § 1396d(a), which sets out the scope of the traditional Medicaid benefits package.  42 U.S.C. § 1396a(a)(43); 42 U.S.C. 1396d(a)(4); 42 U.S.C. § 1396d(r)(1)-(5).  Such treatment services must be covered for Medicaid-eligible children even if the State has not otherwise elected to provide such coverage for other populations.  42 U.S.C. § 1396d(r)(5); see also S.D. ex rel. Dickson v. Hood, 391 F.3d 581, 590 (5th Cir. 2004) (states must "cover every type of health care or service necessary for EPSDT corrective or ameliorative purposes that is allowable under § 1396d(a).").  Thus, a service must be covered by the EPSDT program if it can properly be described as one of the services listed in the Medicaid Act, 42 U.S.C. §1396d(a).  See, e.g., Dickson, 391 F.3d at 594-97 (finding that incontinence supplies were within the scope of home health services described in § 1396d(a) and that the state violated EPSDT provisions by denying Medicaid-eligible child such services); Parents League for Eff. Autism Serv. v. Jones-Kelley, 339 Fed. Appx. 542 (6th Cir. 2009) (affirming preliminary injunction enjoining state from restricting rehabilitative services for Medicaid-eligible children with autism).

---

[23] The Department of Justice previously expressed the concern that children in Mississippi are unnecessarily institutionalized in PRTFs due to insufficient EPSDT services.  See Statement of Interest of the United States of America at 1, Troupe v. Barbour, No. 3:10-153 (S.D. Miss. Apr. 8, 2011).

The scope of the treatment required to be provided under EPSDT includes dental, hearing and vision services, and "[s]uch other necessary health care diagnostic services, treatment, and other measures described in [42 U.S.C. § 1396d(a)] . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are [otherwise] covered under the state plan . . . ." 42 U.S.C. § 1396(r)(1)-(5); see also 42 C.F.R. § 440.130. This includes medically necessary services such as comprehensive assessments, intensive case management services, mobile crisis services, in-home therapy, behavioral support services, family education and training, and therapeutic foster care. See, e.g., Rosie D. v. Patrick, 410 F. Supp. 2d 18, 52-53 (state violated EPSDT provisions by failing to provide to children with serious emotional disorders adequate and effective mobile crisis services, comprehensive assessments, ongoing case management and monitoring, and in-home behavioral support services); see also Katie A. v. L.A. County, 481 F.3d 1150, 1160 (9th Cir. 2007) (holding that states have an obligation under the EPSDT mandate to provide effective in-home behavioral support services to children with mental illness).

Many Medicaid-eligible children enter psychiatric facilities in Mississippi because they are not receiving medically necessary services that the State is required to provide. Children in Mississippi who have mental health, emotional and behavioral needs typically require services such as intensive case management, mobile crisis services, behavioral support, and family education services to avoid unnecessary institutionalization. Mississippi fails to provide these medically necessary treatment services prior to their institutionalization, and instead, these children cycle through local hospitals, State hospitals, and PRTFs, including the Specialized Treatment Facility ("STF"). Removing children from family, friends, and school is an ineffective mode of treatment because it is difficult for children to transfer the skills that they learn back to the home environment, where they will have to employ them. Worse, youth in congregate settings often learn new negative behaviors from one another, rather than learning skills to help them manage behavior and mental illness. As a result, these children tend to cycle through residential settings. Of the 570 children treated in State psychiatric facilities in FY 2010, at least 5 percent were discharged and then readmitted to a State psychiatric facility through a second involuntary admission that same year. Others were almost certainly readmitted to local hospitals, private PRTFs, or juvenile justice facilities. This indicates that children are not receiving sufficient support in their natural communities.

Staff at STF acknowledged that a large number of the children they serve could succeed in their own homes and communities if they received the supports offered to a limited number of children through the MYPAC program.[24] The State itself has found that MYPAC is equally or more effective than institutional placement.[25] Despite this recognition, the State does not divert

---

[24] The MYPAC waiver program serves a limited number of children. In its first year the program had a maximum capacity of 120 children and in the final year the cap is set at 600 youth.

[25] The State found that, "The data indicates the program is as good or better than the traditional system of institutionalization of the seriously emotionally disturbed children and youth in the state of Mississippi. Thus far, the MYPAC program's analyses infer the program is a better plan to treat their participants than the traditional system." MYPAC Second Evaluation Report at 22

all children from segregated congregate placements and offer them effective home-based supports required by EPSDT. CMHCs that typically serve children are not currently authorized to provide the flexible supports in the MYPAC program, so they are not generally offered prior to a referral for residential placement. The State has an obligation to identify the need for services and provide treatment that will ameliorate children's disabilities and cannot wait to offer flexible support until after someone has received the most segregated treatment.

Similarly, the State has failed to provide children with DD in the regional centers and the Mississippi Adolescent Center with the intensive community services required by EPSDT before their institutionalization. Medicaid services such as behavioral support, intensive case management, crisis services, medical care, and personal care enable children with DD and behavioral or medical challenges to remain in their homes and communities. A number of individual support plans listed families' needs for basic supports, or frustration with available services as the reason for placement, but do not indicate that treatment teams explored what services might be available to support children through EPSDT. Rather, families appear to have been offered two options: inadequate basic services under the State's Medicaid Plan or institutional care.

Our consultants found that children in Mississippi's institutional settings could be served in the community if flexible, intensive home-based supports were available, and that children with similar needs are currently served through the MYPAC program. However, the Division of Medicaid and the DMH staff do not provide the supports mandated under EPSDT to help families prevent unnecessary institutionalization. In fact, few providers are aware that EPSDT services are not limited to those services that already exist in the State Plan.

2. *The State Fails to Comply with the IDEA's "Child Find" and "Least Restrictive Environment" Requirements.*

Mississippi school districts must identify, locate, and evaluate all children with disabilities and then serve those children alongside their non-disabled peers to the greatest extent appropriate. 20 U.S.C. § 1412(a)(3). See also Forest Grove School Dist. v. T.A., 129 S.Ct. 2484, 2495 (2009) (describing states' obligations to identify children with disabilities and evaluate them for special education services). Typically, children are identified by their school district, or local education authority ("LEA"). LEA's are then required to provide eligible children with a range of services that can be critical to supporting a child in the community successfully, including positive behavioral support, family education, counseling, speech, language, physical therapies, and assistive technologies. 20 U.S.C. § 1414(d)(1)(A)(IV); 34 C.F.R. § 300.34. A child is eligible for special education services when the child has a disability, including mental retardation or serious emotional disturbance, and "by reason thereof [the child] needs special education and related services." 20 U.S.C. § 1401(3)(A).

The education records of institutionalized children with disabilities in Mississippi reveal that the State fails to adequately identify, locate, and evaluate all children with disabilities. 20

(March 22, 2011, prepared by University of Southern Mississippi's School of Social Work Research Team for Mississippi Division of Medicaid).

U.S.C. § 1412(a)(3). The State identified only 49 of the 123 children who were institutionalized as a result of emotional disturbance as of June 2011 as children qualifying for special education services. Yet our expert found that virtually all children in State psychiatric facilities have disabilities that would adversely impact their ability to learn and, therefore, should be identified as qualifying for special education services. Mississippi's failure to identify children with disabilities as eligible for special education services deprives children of services to which they are entitled under the IDEA – services that can be critical to facilitating successful transitions from State institutions back to local schools, as well as to preventing the unnecessary institutionalization of children in the first place.

Under the IDEA, Mississippi also has an obligation to educate children with disabilities, many of whom were accustomed to integrated schools, alongside their non-disabled peers. 20 U.S.C. § 1412(a)(5)(A). However, Mississippi provides educational services for nearly all of the children in its facilities in highly restrictive settings. In fact, none of the children in the State's psychiatric facilities attend local schools and only 6 percent of the children in facilities serving people with developmental disabilities attend school off-campus. Our expert found no clear criteria for identifying which children would be educated in local schools and no system for evaluating that possibility. However, most of these children did attend public schools with nondisabled peers before they entered a facility, and our experts found that children in State facilities could be educated in less restrictive environments in integrated schools.

## V. RECOMMENDED REMEDIAL MEASURES

To remedy its failure to serve individuals with disabilities, including mental illness and/or developmental disabilities, in the most integrated setting appropriate to their needs, consistent with the mandate of Title II of the ADA and its implementing regulations, the State should promptly implement the minimum remedial measures set forth below:

- Mississippi should reduce its reliance on public and private institutional care, reallocating funds to community based services. The State should make every effort to divert new admissions from State facilities by offering comprehensive supports in the community.

- The State should assess each individual in its institutional settings, based on the principle that, with proper supports and services, all individuals can be served in an integrated community setting. All assessments should include an individualized analysis of the services and supports necessary to ensure successful transition to the community. Assessments for individuals who have histories of multiple institutional admissions should consider and address factors that have led to readmissions. The State also must revise its policies and retrain staff to recognize that individuals need not learn certain skills to be "eligible" for community placement, but rather, individuals best learn independent living skills in real world settings.

- The State should expand the number of waivers slots in order to transition individuals with DD from institutional settings and prevent the admission of

individuals on the waitlist at risk of institutionalization. The State also should ensure that IDD waiver services are sufficient to support individuals, including children and those with complex needs, in integrated community settings.

- The State should ensure that all CHMCs offer intensive community services across the State, including ACT, crisis services, case management, peer support, supportive housing, supported employment, and transportation services to enable individuals with serious mental illness to remain successfully in the community. As many of these services are not now available in every region, it is critical that significant training accompany the service expansion to ensure that providers have competence in offering these services.

- The State should provide adequate medically necessary treatment services to children under EPSDT and ensure that all children with disabilities are identified for special education services under the IDEA. Services that children receive through EPSDT and through their local schools are often the critical supports that enable them to remain with family in their communities.

- The State should provide families with alternatives to institutionalization and give them information they need to make informed choices.

- The State should institute a quality assurance system to ensure the safety of those individuals who are in the community, or return to the community with supports. Professionals should regularly review and assess the safety, treatment, and services provided by the State and by community providers. After each review, the State should require that providers implement plans for correcting any deficiencies identified by the process.

## VI.  CONCLUSION

This letter is a public document, which will be posted on the Department of Justice's website. We hope that you will give this letter careful consideration and that it will assist in facilitating the development and implementation of remedial measures to address outstanding issues of concern. Although we have already had some preliminary discussions about needed remedial steps, we now hope to engage the State in a more in-depth dialogue about remedies in the context of structured negotiations. Ultimately, we hope to be able to reach agreement with the State on a written, enforceable, settlement agreement that would set forth the remedial actions to be taken within a specified period of time to address each outstanding area. Such a disciplined remedial structure would provide all interested parties with the greatest assurance that discrimination will not continue or recur.

We are obligated to inform you that if the State declines to enter into voluntary compliance negotiations or if our negotiations are unsuccessful, the United States may then need to take appropriate action, including initiating a lawsuit, to obtain redress for outstanding concerns associated with the State's compliance with the ADA. We would prefer, however, to resolve this matter by working cooperatively with the State. As referenced above, we are

encouraged by our positive interactions thus far with State leadership, and hope there is a desire to work with the United States toward an amicable resolution.

Thank you again for your ongoing cooperation in this matter. We will contact you soon to discuss the issues referenced in this letter and to set a date and time to meet in person to discuss a remedial framework in which to address any outstanding individual and systemic concerns. If you have any questions, please feel free to contact Jonathan M. Smith, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-5393, or Deena Fox, the lead attorney assigned to this matter, at deena.fox@usdoj.gov, and/or (202) 305-1361.

Sincerely,

Thomas E. Perez
Assistant Attorney General

cc:     Jim Hood, Esq.
        Attorney General
        Office of the Attorney General
        Walter Sillers Building, Suite 1200
        550 High Street
        Jackson, MS  39201

        Cynthia T. Eubank, Esq.
        Special Assistant Attorney General
        Department of Mental Health
        1101 Robert E. Lee Building
        239 N. Lamar Street
        Jackson, MS  39201

        Mr. Edwin C. LeGrand, III
        Executive Director
        Department of Mental Health
        1101 Robert E. Lee Building
        239 N. Lamar Street
        Jackson, MS  39201

        Gene Rowzee, Esq.
        Senior Attorney
        Department of Mental Health
        1101 Robert E. Lee Building
        239 N. Lamar Street
        Jackson, MS  39201

Dr. Robert L. Robinson
Executive Director
Mississippi Division of Medicaid
550 High St., Suite 1000
Jackson MS 39201

T. Richard Roberson Jr., Esq.
Special Assistant to the Executive Director
Mississippi Division of Medicaid
550 High St., Suite 1000
Jackson MS 39201

Ms. Debbie Ferguson
Director
Central Mississippi Residential Center
701 Northside Drive
Newton, MS  39345

Mr. Charles Carlisle
Director
East Mississippi State Hospital
4555 Highland Park Drive
Meridian, MS  39307

Mr. James G. Chastain
Director
Mississippi State Hospital
PO Box 157-A
Whitfield, MS  39193

Dr. Paul A. Callens
Director
North Mississippi State Hospital
1937 Briar Ridge Road
Tupelo, MS  38804

Mr. Clint Ashley
Director
South Mississippi State Hospital
823 Highway 589
Purvis, MS  39475

Mr. Raymond Johnson
Director
Boswell Regional Center
1049 Simpson Highway 149
Magee, MS  39111

Ms. Renee Brett
Director
Ellisville State School
1101 Highway 11 South
Ellisville, MS  39437

Mr. Michael Harris
Director
Hudspeth Regional Center
Highway 475 South
PO Box 127-B
Whitfield, MS  39193-1032

Ms. Edie Hayles
Director
North Mississippi Regional Center
967 Regional Center Drive
Oxford, MS  38655

Ms. Dorothy McEwen
Director
South Mississippi Regional Center
1170 West Railroad Street
Long Beach, MS  39560-4199

Ms. Shirley Miller
Director
Mississippi Adolescent Center
760 Brookman Drive Ext.
Brookhaven, MS  39601

Ms. Stacy Miller
Director
Specialized Treatment Facility
14426 James Bond Road
Gulfport, MS  39503

Felicia C. Adams, Esq.
United States Attorney
Northern District of Mississippi
900 Jefferson Avenue
Oxford, MS  38655-3608

John Dowdy, Esq.
United States Attorney
Southern District of Mississippi
501 East Court Street, Suite 4.430
Jackson, MS  39201